Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-485-2471; fax: 541-485-2457
frost@westernlaw.org

Marc D. Fink, *pro hac vice*
Center for Biological Diversity
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884; fax: 218-525-3857
mfink@biologicaldiversity.org

Lisa T. Belenky (CA Bar No. 203225)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, California 94103
Tel: 415-436-9682 x 307; fax: 415-436-9683
lbelenky@biologicaldiversity.org

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CITIZENS FOR BETTER FORESTRY, ENVIRONMENTAL PROTECTION INFORMATION CENTER, CENTER FOR BIOLOGICAL DIVERSITY, WILD WEST INSTITUTE, GIFFORD PINCHOT TASK FORCE, IDAHO SPORTING CONGRESS, FRIENDS OF THE CLEARWATER, UTAH ENVIRONMENTAL CONGRESS, CASCADIA WILDLANDS PROJECT, KLAMATH SISKIYOU WILDLANDS CENTER, WILD SOUTH, THE LANDS COUNCIL, FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, OREGON WILD, AMERICAN LANDS ALLIANCE, and WILDEARTH GUARDIANS,<br><br>          Plaintiffs,<br><br>          v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, and U.S. FOREST SERVICE,<br><br>          Defendants. | Case No.  CV 08-1927-EMC<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case |

1                                    Introduction.

2    1.      This is a civil action for declaratory and injunctive relief.  Plaintiffs Citizens for Better

3    Forestry *et al.* ("Citizens") challenge the decision of Defendants U.S. Department of Agriculture

4    and U.S. Forest Service ("USDA") to adopt the April 21, 2008, National Forest Management Act

5    final rule ("2008 Rule").  Citizens also challenge the January 18, 2008, Biological Assessment;

6    the February, 2008, Final Environmental Impact Statement ("FEIS"); and the April, 2008,

7    Record of Decision that USDA prepared to support its 2008 Rule.  Plaintiffs allege that USDA

8    violated the National Environmental Policy Act ("NEPA") when it adopted the 2008 Rule, as the

9    FEIS entirely fails to analyze or disclose the potential direct, indirect, and cumulative impacts of

10   the 2008 Rule.  Plaintiffs also allege that the Biological Assessment, including its determination

11   that the 2008 Rule would have no direct or indirect effect on threatened and endangered species,

12   is arbitrary, capricious, and in violation of the Endangered Species Act ("ESA").  Citizens seek a

13   declaratory judgment and an injunction that among other things sets aside the 2008 Rule,

14   prohibits its implementation, and enjoins any site-specific projects that rely on it or tier to it.

15   2.      Should Citizens prevail on the merits, they will seek an award of attorneys' fees, costs,

16   and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

17                                   Jurisdiction.

18   3.      This Court has jurisdiction under 28 U.S.C. § 1331, because this action involves agencies

19   of the United States as defendants, and arises under the laws of the United States, including

20   NEPA, 42 U.S.C. §§ 4321 *et seq*; the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*; and

21   the ESA, 16 U.S.C. § 1536.  An actual, justiciable controversy exists between Citizens and

22   Defendants.  Citizens' request for relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§

23   705 & 706.  Defendants' actions are final and subject to judicial review under 5 U.S.C. §§ 702,

24   704, and 706.

25                       Venue and Intradistrict Assignment.

26   4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).  Plaintiff Environmental

27   Protection Information Center maintains offices in Arcata and Redway, in Humboldt County,

1  California.  Plaintiff Center for Biological Diversity has an office in San Francisco, California.

2  Additional Plaintiffs have members and staff that work or reside within the district.  Defendants

3  also have offices within the district.  More than 1.5 million acres of National Forest lands are

4  also located within the district, and are affected by the challenged decision, including but not

5  limited to the Six Rivers National Forest.  L.R. 3-2.  Assignment is proper in this district and

6  division for the same reasons.  L.R. 3-2, 3-5.

7                                                    Parties.

8  5.      Plaintiff CITIZENS FOR BETTER FORESTRY is a 501(c)(3) nonprofit public interest

9  organization organized under the laws of California and dedicated to the protection of public

10  forest lands in northern California.  Representing hundreds of individuals throughout the region,

11  Citizens for Better Forestry promotes sound science-based management and watershed

12  restoration, and researches, educates, and advocates for the protection and recovery of biological

13  diversity and ecological integrity in the region.  Citizens for Better Forestry works to generate

14  local citizen activism and a greater awareness of forest management practices and impacts to old-

15  growth forests, critical salmonid watersheds, roadless areas, and other important habitats in the

16  Klamath-Siskiyou ecoregion.

17  6.      Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER ("EPIC") is a

18  non-profit corporation organized under the laws of California, dedicated to the protection and

19  restoration of forests, watersheds, and biodiversity in northern California.  Formed in 1977, EPIC

20  has approximately 2,000 members and supporters, and maintains offices in Arcata and Redway,

21  in Humboldt County, California.  EPIC's National Forest Program monitors projects on four

22  national forests in California: the Klamath, Shasta-Trinity, Six Rivers, and Mendocino.  EPIC's

23  members, staff, and board use and enjoy each of these forests, and are particularly interested in

24  those parts of the national forests where relatively intact, mature and old growth forests remain.

25  7.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a conservation organization with

26  over 40,000 members nationwide.  The Center has offices in California, including San Francisco,

27  Shelter Cove, Los Angeles, San Diego, and Joshua Tree.  The Center regularly submits

1   comments and is involved in projects that are proposed on national forests, including the national

2   forests in California.  The Center uses the National Forest Management Act and its implementing

3   regulations in its efforts to conserve and protect national forests in the West.

4   8.      Plaintiff WILD WEST INSTITUTE is a non-profit corporation based in Missoula,

5   Montana.  Wild West's mission is to protect and restore forests, wildlands, watersheds and

6   wildlife in the Northern Rockies.  Wild West empowers citizens to effectively participate in the

7   public land management decision processes on nearly 20 national forests.  Its staff and board also

8   work to help craft positive solutions that promote sustainability in communities in the Northern

9   Rockies through restoring naturally functioning ecosystems.

10  9.      Plaintiff GIFFORD PINCHOT TASK FORCE is a nonprofit conservation organization

11  headquartered in Portland, Oregon.  The mission of the Gifford Pinchot Task Force is to protect

12  and restore the ecosystems and communities of Southeast Washington, with a particular focus on

13  the Gifford Pinchot National Forest.  The Gifford Pinchot Task Force serves as an informational

14  and educational resource on forest ecosystems of southwest Washington for interested citizens

15  and organizations through a variety of avenues, including grassroots organizing and legal

16  advocacy.  The Gifford Pinchot Task Force has over 3,000 members who use the Gifford Pinchot

17  National Forest for many purposes including recreational pursuits, wildlife study, and Native

18  American traditional ceremonies.

19  10.     Plaintiff IDAHO SPORTING CONGRESS is a non-profit conservation organization

20  based in Boise, Idaho whose members reside mostly in Idaho but also in many other states and

21  countries.  The Idaho Sporting Congress actively participates in the agency proceedings and

22  decisions concerning the management of national forests within Idaho.  The Idaho Sporting

23  Congress and its members have participated in Forest Service management decisions and

24  programs since 1983.  The Idaho Sporting Congress has commented on, appealed, and litigated

25  many Forest Service timber sales and grazing plans, participated in many field trips with Forest

26  Service personnel and joined in agency consensus groups intended to guide Forest Service

27  management.

11.     Plaintiff FRIENDS OF THE CLEARWATER is a 501(c)(3) grassroots conservation

organization dedicated to preserving the wildlands and ecological integrity of the Clearwater

River basin, which includes the Clearwater, Nez Perce, and St. Joe National Forests in Idaho.

Friends of the Clearwater is based in Moscow, Idaho and has been active in many aspects of local

forest planning.  Friends of the Clearwater participates in public involvement processes through

comments, public meetings, and open houses and also sponsors free public events, field trips and

seminars.  Friends of the Clearwater's members and supporters are also active in these processes.

12.     Plaintiff UTAH ENVIRONMENTAL CONGRESS is a 501(c)(3) environmental

organization dedicated to the protection and preservation of Utah's national forests and native

wildlife species.  The Utah Environmental Congress has individual, organization, and business

members representing about 30,000 citizens.  Seventy percent of the State of Utah is held in trust

as public land for all American citizens.  The Utah Environmental Congress is committed to

holding public land management agencies accountable to federal environmental laws.

13.     Plaintiff CASCADIA WILDLANDS PROJECT is a 501(c)(3) conservation organization

based in Eugene, Oregon, with members in Washington, Oregon, and California.  The Cascadia

Wildlands Project advocates for biodiversity on public lands, with a particular emphasis on the

national forests in the Cascadia region.  The Cascadia Wildlands Project has a long-standing

interest in the sound management of public lands in the region, and is involved with a number of

projects and campaigns to protect salmon and other threatened and endangered fish species.

14.     Plaintiff KLAMATH SISKIYOU WILDLANDS CENTER is a 501(c)(3) conservation

organization with over 600 members.  The Klamath Siskiyou Wildlands Center is dedicated to

protecting the unique biological diversity, clean water, old growth forests, and aesthetic values of

the Klamath-Siskiyou bioregion of southwestern Oregon and northern California.  Klamath

Siskiyou Wildlands has an interest in ensuring that NEPA, the National Forest Management Act,

and other environmental laws are enforced on national forests.

15.     Plaintiff WILD SOUTH is a non-profit organization whose mission is to inspire and

empower people to protect and restore the native ecosystems of the Southeast. Wild South has

1    over 1,500 members and uses a blend of public education, outreach, research, advocacy, science,

2    and when necessary legal action to accomplish its mission.  Wild South is committed to holding

3    state and federal public land management agencies accountable to environmental laws intended

4    to preserve and protect natural resources.  Wild South interests include the integrity of the

5    millions of acres of National Forest land located in Alabama, Louisiana, Mississippi, Florida,

6    Tennessee, South Carolina, North Carolina, Georgia, and Virginia. These biologically rich areas

7    serve as islands of habitat and refuge amid the increasing development pressures in the

8    landscape. Wild South staff and members have spent countless hours documenting,

9    photographing, and reporting on the National Forests in its region.

10    16.    Plaintiff THE LANDS COUNCIL is a regional nonprofit environmental organization

11    with its principal office in Spokane, Washington.  The Lands Council has members in

12    Washington, Oregon, Idaho, Montana, and other states.  The Lands Council is dedicated to

13    promoting long-term community and biological sustainability of the greater Columbia River

14    Basin through education and participation in public agency decision-making processes.  The

15    Lands Council oversees forest-watch groups in Washington, Oregon and Idaho.

16    17.    Plaintiff FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS

17    ("FSEEE") is a nonprofit organization headquartered in Eugene, Oregon.  FSEEE's mission is to

18    forge a socially responsible value system for the Forest Service based on a land ethic that ensures

19    ecologically and economically sustainable resource management.  Thousands of concerned

20    citizens, present, former, and retired Forest Service employees and other resource managers

21    comprise FSEEE.

22    18.    Plaintiff OREGON WILD is a nonprofit corporation organized under the laws of the State

23    of Oregon.  ONRC is headquartered in Portland, Oregon.  ONRC's mission is to protect and

24    restore Oregon's wild lands, wildlife, and water as an enduring legacy.  ONRC has approximately

25    6000 individual and organizational members, many of whom use and enjoy the national forests

26    and BLM lands of Oregon, Washington, and California for recreational, educational, aesthetic,

27    and other purposes.

19.    Plaintiff AMERICAN LANDS ALLIANCE is a national non-profit conservation organization. The mission of American Lands Alliance is to protect and restore America's forest ecosystems by providing national leadership, coordination, and capacity building for the forest conservation movement.  American Lands Alliance is headquartered in Washington, DC where decisions are made on national forest issues to effectively educate and advocate for sound management policies for the National Forest System.  American Lands represents citizen activists across the country and local and regional forest conversation organizations whose members recreate on National Forests.  American Lands relies on the National Forest Management Act and its implementing regulations to meet the organization's core mission of protecting and restoring the National Forest System.

20.    Plaintiff WILDEARTH GUARDIANS is a nonprofit organization with more than 4,500 members from all across the country, the majority of who live in the Four Corners states.  Since 1989, WildEarth Guardians, its staff, and its members have been committed to the protection of intact forest ecosystems throughout the west.  To achieve this protection, WildEarth Guardians works through public education, administrative appeals, litigation, and otherwise to ensure that all federal agencies comply fully with federal environmental laws, including NEPA and the ESA. WildEarth Guardians' members and staff frequently use, benefit from, and enjoy forest lands in the National Forests of the United States for recreational, aesthetic, and scientific activities. In pursuit of these activities, WildEarth Guardians' members and staff regularly observe and enjoy wildlife in its natural habitat.  WildEarth Guardians' members and staff intend to continue to use the National Forests for these purposes in the future.

21.    Citizens' members use and enjoy national forests for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities.  Citizens' members derive recreational, inspirational, religious, scientific, educational, and aesthetic benefit from their activities within the national forest system.  Citizens' members intend to continue to use and enjoy the national forests frequently and on an ongoing basis in the future, including this spring and summer.

22.     Citizens have a procedural interest in the Forest Service fully complying with NEPA's environmental analysis and public disclosure requirements in the development, promulgation, and implementation of the 2008 Rule.

23.     The aesthetic, recreational, scientific, educational, religious, and procedural interests of Citizens' members have been adversely affected and irreparably injured by the process by which USDA promulgated the 2008 Rule, and will be adversely affected and irreparably injured by its implementation.  These are actual, concrete injuries caused by USDA's failure to comply with mandatory duties under NEPA and the ESA.  The injuries would be redressed by the relief sought.

24.     Citizens and their members have been extensively involved in the public comment and administrative process for both the 2008 Rule and the related FEIS.

25.     Defendant U.S. DEPARTMENT OF AGRICULTURE is the executive agency that oversees the U.S. Forest Service.  The Secretary of Agriculture is responsible for promulgating regulations pursuant to the National Forest Management Act.

26.      Defendant U.S. FOREST SERVICE is an agency of the Department of Agriculture.  It and its officers are responsible for the lawful management of the national forest system.

                                        Facts.

27.     The National Forest System includes 192 million acres of land in 42 states, the Virgin Islands, and Puerto Rico.  The system is comprised of 155 national forests, 20 national grasslands, and various other lands under the jurisdiction of the Department of Agriculture.

28.     The national forests and grasslands provide many and diverse benefits to the American people, including clean air and water, productive soils, biological diversity, goods and services, and recreation.  Even though much of the National Forest System has been significantly degraded, the national forests generally remain less disturbed than the private lands surrounding them, and provide increasingly important habitat for many plant and animal species.

29.     Congress enacted the National Forest Management Act ("NFMA") in 1976.  During Senate hearings on NFMA, Senator Hubert Humphrey observed that the Forest Service's record

1    had brought into question the extent to which the agency could be trusted to guard and manage

2    public resources.  Senator Humphrey declared: "The days have ended when the forest may be

3    viewed only as trees and trees viewed only as timber.  The soil and the water, the grasses and the

4    shrubs, the fish and the wildlife, and the beauty that is the forest must become integral parts of

5    resource managers' thinking and actions."

6    30.    NFMA sets forth a three-tiered approach to forest management.  At the highest tier,

7    NFMA requires the Secretary of Agriculture to promulgate national regulations that govern the

8    development of regional and site-specific plans.  16 U.S.C. § 1604(g).  The national regulations

9    require that the lower level plans comply with NEPA, and require the Secretary of Agriculture to

10   set standards and guidelines regarding forest resources such as plant and animal species

11   conservation, timber management, and water management.  The nationwide, regulatory standards

12   and guidelines must be followed when the Forest Service prepares regional or site-specific plans.

13   This highest-tier of national regulations is at issue in this case.

14   31.    The second tier of regulatory oversight on national forest system lands is the "land and

15   resource management plan" ("Forest Plan") that is prepared for each individual national forest or

16   grassland.  16 U.S.C. § 1604(a).  The Forest Plans operate like zoning ordinances, defining the

17   uses allowed in various areas of each forest, and setting goals and limits on various uses, such as

18   logging and road construction.  The content and promulgation of the Forest Plans must comply

19   with the national regulations.

20   32.    The third tier is the so-called "site-specific" plans, which are prepared to effect specific,

21   on-the-ground actions.  Site-specific plans must be consistent with both sets of higher-level rules,

22   that is, both the applicable Forest Plan as well as the nationwide NFMA regulations.  16 U.S.C. §

23   1604(i).

24   33.    NFMA requires the Secretary of Agriculture to promulgate regulations that set out the

25   process for the development and revision of Forest Plans, and include the guidelines and

26   standards that are prescribed in the statute.  The regulations promulgated under NFMA must

27   include, among other things, procedures to insure that Forest Plans are prepared in accordance

1    with NEPA; guidelines which require the identification of the suitability of lands for resource

2    management; guidelines which provide for diversity of plant and animal communities based on

3    the suitability and capability of the specific land area; guidelines to insure that timber is

4    harvested from national forest lands only where soil, slope and watershed conditions are not

5    irreversibly damaged, and protection is provided for streams and other bodies of water from

6    detrimental changes in water temperatures and sediment; and guidelines which insure that

7    clearcutting will be used as a cutting method on National Forest System lands only where there

8    are established according to geographic areas, forest types, or other suitable classifications the

9    maximum size limits for areas to be cut in one harvest operation.

10    34.    NFMA requires the Secretary of Agriculture to appoint a "Committee of Scientists" who

11    are not officers or employees of the Forest Service to provide scientific and technical advice and

12    counsel in promulgating NFMA regulations.  NFMA provides that the Secretary may appoint

13    such a committee when revising the regulations.

14    35.    USDA first promulgated regulations implementing NFMA in 1979.  44 Fed. Reg. 53928

15    (Sept. 17, 1979).  The 1979 Rule was accompanied by an "environmental impact statement"

16    ("EIS"), which analyzed the environmental impact of the regulations.

17    36.    After convening a Committee of Scientists to obtain its advice, the Department of

18    Agriculture revised the NFMA regulations in 1982.  47 Fed. Reg. 43026 (Sept. 30, 1982).  When

19    initially published as a draft rule, the 1982 Rule was accompanied by an "environmental

20    assessment" ("EA").  47 Fed. Reg. 7678, App. A at 7694 (Feb. 22, 1982).

21    37.    The 1982 Rule sets out a comprehensive approach to forest management, implementing

22    the statutory directive.  The 1982 Rule applied to and governed the promulgation and

23    management of Forest Plans, and also applied to and governed individual, site-specific projects

24    proposed on national forests.  The 1982 Rule requires the Forest Service to manage fish and

25    wildlife habitat to maintain viable populations of existing native and desired non-native species

26    in the planning area.  Under the 1982 Rule, a viable population is regarded as one which has the

27    estimated numbers and distribution of reproductive individuals to insure its continued existence

1    is well distributed in the planning area.  The 1982 Rule provides that, in order to insure that

2    viable populations will be maintained, habitat must be provided to support, at least, a minimum

3    number of reproductive individuals and that habitat must be well distributed so that those

4    individuals can interact with others in the planning area.

5    38.    In order to estimate the effects of activities on fish and wildlife populations, the 1982

6    Rule requires the Forest Service to identify "management indicator species," which are used as a

7    bellweather for the other species that have the same special habitat needs or population

8    characteristics.  The Forest Service is required to monitor the population trends of the

9    management indicator species, and planning alternatives are to be evaluated in terms of both the

10   amount and quality of habitat and of animal population trends of the management indicator

11   species.  The Forest Service has frequently failed to comply with its monitoring and viability

12   requirements for management indicator species.

13   39.    The 1982 Rule sets forth specific, mandatory requirements governing the development

14   and implementation of forest plans, as well as site-specific projects.  According to these

15   requirements, all management prescriptions must, among other things, conserve soil and water

16   resources and not allow significant or permanent impairment of the productivity of the land;

17   protect streams, streambanks, shorelines, lakes, and wetlands; provide for adequate fish and

18   wildlife habitat to maintain viable populations of existing native vertebrate species; and include

19   measures for preventing the destruction or adverse modification of critical habitat for threatened

20   and endangered species.

21   40.    The 1982 Rule requires that special attention be given to land and vegetation for

22   approximately 100 feet from the edges of all perennial streams, lakes, and other bodies of water.

23   Within this riparian area, no management activities causing detrimental changes in water

24   temperature or chemical composition, blockages of water courses, or deposits of sediment are

25   permitted which seriously and adversely affect water conditions or fish habitat.

26

27

41.    The 1982 Rule requires that the conservation of soil and water resources be guided by instructions in official technical handbooks, which must show specific ways to avoid or mitigate damage, and maintain or enhance productivity on specific sites.

42.    The 1982 Rule requires, with limited exceptions, that clearcuts not exceed 60 acres for the Douglas-fir forest type of California, Oregon and Washington; 80 acres for the southern yellow pine types; 100 acres for the hemlock-sitka spruce forest type of coastal Alaska; and 40 acres for all other forest types.

43.    The 1982 Rule requires the preservation and enhancement of the diversity of plant and animal communities so that such diversity is at least as great as that which would be expected in a natural forest.

44.    The 1982 Rule requires that lands suitable for grazing be identified and their condition and trend determined.  The present and potential supply of forage for livestock, wild and free-roaming horses and burros, and the capability of these lands to produce suitable food and cover for selected wildlife species must be estimated.  Lands in less than satisfactory condition must be identified and appropriate action planned for their restoration.

45.    The 1982 Rule requires that forest plans identify physical and biological characteristics that make land suitable for recreational opportunities.  Off-road vehicle use is required to be planned and implemented to protect the land and other resources.  Forest planning must classify areas and trails of National Forest System lands as to whether or not off-road vehicle use may be permitted.

46.    The 1982 Rule requires a regional guide to be developed for each region of the Forest Service.  Regional guides must provide standards and guidelines for addressing major issues and management concerns which need to be considered at the regional level to facilitate forest planning.  The 1982 Rule requires that an environmental impact statement by prepared for the proposed standards and guidelines in the regional guide, according to NEPA procedures.  The Chief of the Forest Service is required, under the 1982 Rule, to either approve or disapprove each regional guide, and issue his decision in a record of decision, pursuant to NEPA.

47.     The 1982 Rule establishes a process for amending and revising existing forest plans. Pursuant to the 1982 Rule, if a forest supervisor determines that a proposed amendment is significant, the supervisor is required to follow the same procedures as that required for development and approval of an initial forest plan.  If the amendment is determined not to be significant, the supervisor is still required to satisfy NEPA procedures.

48.     The 1982 Rule requires each forest supervisor to review the conditions of the forest at least every 5 years to determine whether conditions or demands of the public have changed significantly.  Under the 1982 Rule, a forest plan must be revised on a 10-year cycle or at least every 15 years.

49.     In 1991, the Forest Service published notice that it was going to revise the 1982 Rule.  On April 13, 1995, the Forest Service published a proposed rule, which was never finalized.

50.     In June, 1996, the Forest Service prepared a one-page "biological assessment" for its "effort to revise and streamline land and resource management planning procedures for the National Forest System."  According to the 1996 biological assessment, at that time, over 280 threatened or endangered species were known to occur on National Forest System lands.

51.     In December, 1997, the Secretary of Agriculture convened a 13-member "Committee of Scientists" to review the Forest Service planning process and to offer recommendations for revising the regulations.  In March, 1999, the Committee of Scientists released a final report concerning the Forest Service planning process.

52.     On October 5, 1999, the Forest Service published a proposed rule to revise the 1982 Rule. Unlike previous draft rules, the 1999 proposed rule did not include any analysis of its potential environmental impact and did not specifically solicit comments on this matter.  On November 9, 2000, the Forest Service published the National Forest System Land and Resource Management Planning Final Rule ("2000 Rule") in the Federal Register.  65 Fed. Reg. 67513 (Nov. 9, 2000).

53.     The 2000 Rule substantially modified the 1982 Rule.  The 2000 Rule eliminated many of the "minimum management requirements" from the 1982 Rule.  The 2000 Rule weakened the species "viability" requirement by providing that plan decisions affecting species diversity must

1   provide only for ecological conditions that provide a high likelihood that those conditions are

2   capable of supporting over time the viability of species.  The 2000 Rule eliminated the

3   requirement of developing regional guides to maintain consistency in forest management.

4   54.    Many of the plaintiffs in this case filed suit to challenge the 2000 Rule.  USDA noted that

5   serious concerns had arisen regarding some of the provisions of the 2000 Rule, including the

6   Rule's impact on ecological sustainability and species viability.  *See* 66 Fed. Reg. 27552 (May

7   17, 2001).  USDA issued an "interim rule" to extend for one year the date by which forest plan

8   amendments and revisions were required to comply with the 2000 Rule.  *Id.*  During the interim

9   period, national forests were allowed to choose between the 1982 Rule or the 2000 Rule when

10   preparing amendments or revisions to forest plans.  *Id*. at 27,553.  Certain national forests,

11   including but not limited to those in the Southern and Eastern Regions of the Forest Service,

12   have recently revised forest plans under the 1982 Rule.

13   55.    In *Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961, 970-71

14   (9th Cir. 2003), the Ninth Circuit ruled that USDA violated NEPA in its development and

15   promulgation of the 2000 Rule.  The Ninth Circuit also held that the because the 2000 Rule

16   controlled the development of forest plans and site-specific projects, the Rule posed an actual,

17   physical effect on the environment in national forests and grasslands.

18   56.    After the Ninth Circuit's decision, USDA extended the transition period for site-specific

19   projects in an "interim" rule, 68 Fed. Reg. 53,294 (September 10, 2003), which extended the date

20   for when site-specific projects must comply with the 2000 Rule until the date of the adoption of

21   new planning regulations.

22   57.    USDA issued an "interpretative" rule on September 29, 2004.  69 Fed. Reg. 58,055 (Sept.

23   29, 2004).  This interpretative rule stated that because of the transition provision in the 2000

24   Rule, the 1982 Rule was no longer in effect, at least for site-specific projects.  *See* 69 Fed. Reg.

25   at 58,057, App. B to Sec. 219.35 ("Until a new final rule is promulgated, the transition

26   provisions of [the 2000 Final Rule] remain in effect.  The 1982 rule is not in effect.").  Since

27   USDA had also extended the date by with site-specific projects must comply with the 2000 Rule,

1  its position was that there were no regulations to govern any activities on the 192 million acre

2  National Forest System.  The only provision that applied to any site-specific project on any

3  national forest, according to USDA, was that the Forest Service was required to "consider" (but

4  not necessarily use or apply) the "best available science."

5  58.     On January 5, 2005, USDA formally withdrew and removed the 2000 Rule.  70 Fed. Reg.

6  1022 (Jan. 5, 2005).

7  59.     On January 5, 2005, USDA also published a new rule to govern the process and content

8  of forest plans and site-specific projects throughout the National Forest System.  70 Fed. Reg.

9  1023 (Jan. 5, 2005) ("2005 Rule").  Most of the plaintiffs in this case, along with another set of

10  conservationists and the State of California, filed suit to challenge the 2005 Rule.

11  60.     On December 15, 2006, USDA published in the Federal Register a category of actions

12  that are "categorically excluded" from analysis under NEPA.  71 Fed. Reg. 75481 (Dec. 15,

13  2006). The actions include the revision of forest plans.

14  61.     On March 30, 2007, this Court held that USDA violated NEPA, the ESA, and the

15  Administrative Procedure Act in promulgating the 2005 Rule, and enjoined USDA from

16  implementing or utilizing the 2005 Rule.  *Citizens for Better Forestry v. U.S. Dept. of*

17  *Agriculture*, 481 F.Supp.2d 1059 (N.D. Cal. 2007).  Because the 2005 Rule may significantly

18  affect the quality of the human environment under NEPA, and because it may affect listed

19  species and their habitat under the ESA, this Court ordered USDA to conduct further analysis

20  and evaluation of the impact of the 2005 Rule in accordance with those statutes.

21  62.     On August 23, 2007, USDA issued a new "proposed rule" that was essentially identical to

22  the 2005 Rule.  72 Fed. Reg. 48,514-15 (August 23, 2007).

23  63.     In August, 2007, USDA prepared a Draft EIS on its new proposed rule.  The Draft EIS,

24  however, entirely failed to analyze or disclose the potential direct, indirect, and cumulative

25  impacts of the proposed rule on the environment.

26

27

64.     USDA accepted public comments on the proposed rule and Draft EIS, and Citizens provided detailed comments on both the proposed rule and Draft EIS.  USDA received approximately 79,500 comments on the proposed rule and Draft EIS.

65.     On January 18, 2008, USDA completed a six-page "biological assessment" on the 2008 Rule.  USDA concluded that the 2008 Rule would have no direct or indirect effect on threatened, endangered, or proposed species or to designated or proposed critical habitat.  USDA did not obtain written concurrence on its "no effect" determination for the 2008 Rule from the United States Fish and Wildlife Service or the National Marine Fisheries Service.

66.     In February, 2008, USDA completed the FEIS on the proposed rule.  The FEIS entirely fails to analyze or disclose the potential direct, indirect, and cumulative impacts of the proposed rule on the environment.

67.     On April 9, 2008, USDA signed a Record of Decision, selecting Alternative "M" from its February, 2008, FEIS.  Alternative M differs slightly from the 2005 Rule, in that it "allows" individual national forests to include standards within forest plans, and also includes some of the National Forest Management Act's timber management requirements that the 2005 Rule had instead placed within the Forest Service's internal handbook.

68.     On April 21, 2008, USDA published the 2008 Rule in the federal register, which states that the 2008 Rule takes effect on April 21, 2008.  73 Fed. Reg. 21468 (April 21, 2008).

69.     The 2008 Rule significantly weakens or eliminates substantive environmental requirements and provisions of the 1982 Rule, as well as provisions of the 2000 Rule.

Statutory Background: NEPA

70.     NEPA is our basic national charter for protection of the environment.  40 C.F.R. § 1500.1(a)).  "NEPA was passed by Congress to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

71.     The purpose of NEPA is to ensure "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience that may also play a role in both the decisionmaking process and implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

72.     NEPA requires federal agencies to prepare an EIS for any "major Federal action" that may "significantly affect" the quality of the human environment. 42 U.S.C. § 4332(C). In addition to a detailed statement of the environmental impact of the proposed action, the EIS must address any adverse effects that cannot be avoided should the proposal be implemented, alternatives to the proposed action, and any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *Id.*

73.     An EIS must include an explanation of the purpose and need for the proposed action, alternatives, the "affected environment," and the "environmental consequences." *See* 40 C.F.R. §§ 1502.10, 1502.14, 1502.15, 1502.16. The environmental consequences section must include discussions of direct effects, indirect effects, the environmental effects of alternatives, energy requirements and conservation potential of various alternatives and mitigation measures, and means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.16.

74.     An EIS must also consider the potential cumulative impacts of the proposed action when viewed with other past, present and reasonably foreseeable future actions. 40 C.F.R. §§ 1508.7, 1508.25.

75.     Agencies must insure the professional integrity, including scientific integrity, of the discussion and analysis in an EIS. 40 C.F.R. § 1502.24. The information in an EIS must be of high quality, as accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. 40 C.F.R. §§ 1500.1(b), 1502.24.

76.    A Record of Decision must state whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. 40 C.F.R. § 1505.2(c).

Statutory Background: ESA

77.    Section 7(a)(2) of the ESA requires each federal agency, in consultation with the United States Fish and Wildlife Service and/or National Marine Fisheries Service, to insure that any proposed action is not likely to jeopardize the continued existence of a threatened or endangered species, or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2). "Action" is defined to include the promulgation of regulations, and actions that may directly or indirectly cause modifications to the land, water, or air. 50 C.F.R. § 402.02.

78.    When threatened or endangered species may be present in an area where an action is proposed, the agency must prepare a "biological assessment" to determine whether the listed species or their critical habitat may be affected by the proposed action. 16 U.S.C. § 1536(c)(1). If the agency determines that an action it proposes to take may affect any listed species or critical habitat, it must engage in formal consultation with the expert agency (the United States Fish and Wildlife Service and/or National Marine Fisheries Service, depending on the species at issue). 50 C.F.R. § 402.14.

79.    After consultation is completed, the relevant Service(s) must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. If the Service concludes that the proposed action "will jeopardize the continued existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A). If the biological opinion concludes that the action will not result in jeopardy, the Service must provide an "incidental take statement" specifying the impact of such incidental taking on the species, any "reasonable and prudent measures" that the Service considers necessary to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the agency to implement those measures. 16 U.S.C. § 1536(b)(4).

80.    The "may affect" threshold for triggering consultation under the ESA is exceedingly low. "Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement." *Nat'l Wildlife Fed'n v. FEMA*, 345 F.Supp.2d 1151, 1174 (W.D. Wash. 2004), *quoting* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

First Claim for Relief: USDA Violated NEPA.

81.    Citizens incorporate by reference all preceding paragraphs.

82.    The FEIS that USDA prepared for the 2008 Rule violates NEPA by failing to adequately describe the "affected environment." 40 C.F.R. § 1502.15.

83.    The FEIS violates NEPA by failing to adequately consider, analyze, or disclose the direct, indirect, and cumulative effects of the 2008 Rule on the environment, including but not limited to: effects on terrestrial and aquatic species, including the continued viability of species that rely and depend on national forest system lands; effects related to soils; effects related to wildfire; effects related to late seral or old growth forests; effects related to watersheds, water quality, and supplies of drinking water; effects related to roadless characteristics; and effects related to climate change (global warming), including carbon sequestration. 40 C.F.R. § 1502.16.

84.    The FEIS fails to include a sufficient disclosure of the effects of the various alternatives, including specifically the effects of continued implementation of the 1982 Rule. 40 C.F.R. §§ 1502.14, 1502.16(d).

85.    The FEIS fails to consider, analyze, or disclose the potential irretrievable and irreversible commitments of resources, including but not limited to the loss of mature and old growth forests and extirpation of species. 42 U.S.C. § 4332(2)(C)(v).

86.    USDA failed to insure the professional integrity, including scientific integrity, of the discussion and analysis in the FEIS. 40 C.F.R. § 1502.24.

87.    The Record of Decision prepared for the 2008 Rule fails to adequately address whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. 40 C.F.R. § 1505.2(c).

88.    By relying on an inadequate FEIS and Record of Decision, USDA violated NEPA in developing and promulgating the 2008 Rule.

89.    The failure of USDA to comply with NEPA in preparing the FEIS, Record of Decision and 2008 Rule constitutes arbitrary and capricious agency action, and was an abuse of discretion and not in accordance with law, pursuant to the Administrative Procedure Act.  5 U.S.C. § 706(2).  The FEIS, Record of Decision and 2008 Rule should therefore be held unlawful and set aside.  *Id.*

Second Claim for Relief: USDA's Biological Assessment and No Effect Determination
for the 2008 Rule Are Arbitrary, Capricious, and Contrary to the ESA.

90.    Citizens incorporate by reference all preceding paragraphs.

91.    The 2008 Rule decreases and eliminates previous substantive environmental requirements that applied to forest plans and site-specific projects throughout the national forest system.

92.    Because the 2008 Rule controls the development of forest plans and site-specific projects, it poses an actual, physical effect on the environment in national forests and grasslands.  *Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961, 973 (9th Cir. 2003).

93.    The January 18, 2008 Biological Assessment for the 2008 Rule ignores the importance of the nationwide National Forest Management Act regulations for the development of forest plans and site-specific projects, which will result in at least indirect impacts on listed species and critical habitat.  The Biological Assessment also ignores the fact that the 2008 Rule decreases and eliminates previous environmental requirements and protections for fish and wildlife species.

94.    The 2008 Rule will at least indirectly result in adverse impacts to some of the hundreds of listed species that depend on national forest lands, as well as their critical habitat.

95.    USDA's Biological Assessment for the 2008 Rule, including its determination that the Rule will have no direct or indirect effect on any threatened or endangered species, or critical habitat, is arbitrary, capricious, and abuse of discretion, and contrary to the ESA.  5 U.S.C. § 706(2)(A).  The Biological Assessment and 2008 Rule should therefore be held unlawful and set aside.  *Id.*

Relief Requested.

Citizens respectfully request that this Court:

A.     Declare that the 2008 Rule, FEIS and Record of Decision violate NEPA;

B.     Declare that the January 18, 2008, Biological Assessment for the 2008 Rule is arbitrary, capricious, and contrary to the ESA;

C.     Set aside the 2008 Rule, FEIS, and Record of Decision;

D.     Enjoin USDA from any implementation of the 2008 Rule, including any site specific project that relies on or tiers to it;

E.     Reinstate the 1982 Rule to govern the Forest Service's revision and amendment of Forest Plans, and the implementation of individual, site-specific projects and decisions, on the National Forest System;

F.     Award Plaintiffs to recover their attorneys' fees, costs, and other expenses, under applicable law; and

G.     Grant Plaintiffs such further relief as may seem to this Court to be just, proper, and equitable.

Date: April 23, 2008.                    Respectfully submitted,

/s/ Lisa T. Belenky
Lisa T. Belenky (CA Bar No. 203225)
Peter M.K. Frost, *pro hac vice*
Marc D. Fink, *pro hac vice*

Attorneys for Plaintiffs