TRENT W. ORR, State Bar No. 77656
GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
Tel. (510) 550-6725
Fax (510) 550-6749
torr@earthjustice.org; gloarie@earthjustice.org

TIMOTHY J. PRESO, *Pro Hac Vice*
Earthjustice
209 S. Willson Avenue
Bozeman, MT 59718
Tel. (406) 586-9699
Fax (406) 586-9695
tpreso@earthjustice.org

SIERRA B. WEAVER, *Pro Hac Vice*
Defenders of Wildlife
1130 17th Street, NW
Washington, DC 20036-4604
Tel. (202) 682-9400, ext. 263
Fax (202) 682-1331
sweaver@defenders.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, SIERRA CLUB, THE WILDERNESS SOCIETY, and VERMONT NATURAL RESOURCES COUNCIL,<br><br>        Plaintiffs,<br><br>        vs.<br><br>ED SCHAFER, Secretary, U.S. Department of Agriculture, in his official capacity; GAIL KIMBELL, Chief, U.S. Forest Service, in her official capacity; and U.S. FOREST SERVICE,<br><br>        Defendants. | Case No. 08-2326 CW<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     This case involves the continuing efforts of the current U.S. Department of Agriculture, acting through its agency the U.S. Forest Service (both agencies referred to collectively here as "Forest Service"), to revoke important and longstanding regulatory protections for the 193-million-acre National Forest System.  Through its action challenged in this case, the Forest Service has once again eliminated from the regulations governing planning and management of the national forests (referred to generically as "NFMA Regulations") environmentally protective standards required to be in these regulations by the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*.  The NFMA Regulations govern virtually every significant action on every acre of each of the 155 national forests and 20 national grasslands.  Defendants have accomplished this abandonment of resource protection standards contained in prior versions of the NFMA Regulations through the deletion of such standards from their latest version of revised NFMA Regulations published in the Federal Register April 21, 2008.  73 Fed. Reg. 21468.  Plaintiffs challenge the rulemaking that concluded with that publication of the revised regulations and accompanying Record of Decision, as well as the Final Environmental Impact Statement ("FEIS") and the Biological Assessment ("BA") prepared on that rulemaking.

2.     Since their adoption in 1982, a set of NFMA Regulations ("1982 Rule") has mandated a number of vital protections for the natural environments of the national forests, including regulations that require that each national forest be managed to maintain viable populations of existing native species, that "management indicator species" be identified and monitored as indicators of the health of forest ecosystems, that harmful management practices not be employed within 100-foot buffer zones around water bodies to protect water conditions and fish habitat, and that wildlife habitat needs be accounted for in livestock grazing decisions.  Further, the 1982 Rule provides detailed standards and procedures for identifying national forest lands not suitable or appropriate for timber production.  These and associated regulations have operated for more than two decades to protect wildlife and fish, soils, water quality and quantity, slope stability, outdoor recreation, scenic vistas, and other public resources of the National Forest System.  The 1982 Rule imposes an important check on national forest management, ensuring that the agency's

1    authorization of logging, oil and gas drilling, and other commercial activities does not lead to the

2    destruction of valuable environmental resources.

3        3.    However, in the years since the 1982 Rule was promulgated, the Forest Service has

4    repeatedly violated its protective provisions, most particularly by failing in a number of instances to

5    take legally required steps to ensure that environmentally harmful activities on the national forests

6    do not push wildlife populations past the point of viability.  Despite a series of judicial decisions

7    finding the Forest Service in violation of the 1982 Rule, the agency generally has not attempted to

8    modify its actions to ensure compliance with the wildlife viability regulations.  Instead, the Forest

9    Service under the current administration has sought to repeal nearly all of the detailed resource

10   standards in the 1982 Rule through a radical revision of the NFMA Regulations that itself does not

11   comport with the requirements of NFMA.

12       4.    The rulemaking challenged here is not the current administration's first attempt to

13   revise the NFMA Regulations to eliminate existing resource protection standards.  On January 5,

14   2005, the Department published a final rule revising the NFMA Regulations ("2005 Rule") in a

15   manner that stripped them of virtually all of the resource protection standards that the NFMA

16   expressly requires these regulations to provide.  Such protections were contained in the 1982 Rule

17   and, in a different form, in a revised set of NFMA regulations published in November 2000 ("2000

18   Rule").  The 2000 Rule has never been used to guide the adoption or revision of management plans

19   for the individual national forests because of the change of administrations shortly after their

20   publication and the new administration's subsequent suspension of that rule.  The plaintiffs in this

21   action challenged the 2005 Rule as having been promulgated in violation of the Administrative

22   Procedure Act ("APA"), 5 U.S.C. §§ 553, 701-706, and the National Environmental Policy Act

23   ("NEPA"), 42 U.S.C. § 4321 *et seq.*  *Defenders of Wildlife, et al. v Johanns, et al.*, no. 04-4512 PJH,

24   First Supplemental Complaint (N.D. Cal., filed Feb. 17, 2005).  A second case challenging the 2005

25   regulations also alleged that the regulations had been promulgated in violation of the Endangered

26   Species Act, 16 U.S.C. § 1530 *et seq.* ("ESA").  *Citizens for Better Forestry, et al. v. U.S. Dept. of*

27   *Agriculture, et al.*, no. 05-1144 PJH, Complaint (N.D. Cal., filed Mar. 21, 2005).  Following

28   consolidated briefing and argument on motions for summary judgment in these two cases, the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 08-2326 CW        3

District Court ruled that the 2005 Rule had been promulgated in violation of the APA, NEPA, and ESA, set aside the regulations, and issued an injunction against their implementation until such time as the statutory violations were cured. *Citizens for Better Forestry v. USDA*, 481 F.Supp.2d 1089, 1100 (N.D. Cal. 2007).

5. The rulemaking challenged in this case is the final rule revising the NFMA Regulations in a manner that once again strips the regulations previously in effect of many resource protection standards. With minor exceptions, it is substantially identical to the 2005 Rule. The new NFMA rulemaking is referred to herein as the "2008 Rule."

6. Defendants' promulgation of the 2008 Rule violated NEPA though their failure to prepare an adequate environmental impact statement on the 2008 Rule, despite the far-reaching environmental impacts that the 2008 Rule's abandonment of environmentally protective standards will have on national forests across the country. The FEIS prepared on the rulemaking contains no analysis whatsoever of the potential impacts on the natural resources of the national forests of adopting the 2008 Rule as compared to other regulatory regimes put forth as alternatives, including the 1982 Rule and the 2000 Rule.

7. Defendants violated the ESA in promulgating the 2008 Rule by failing to consult with the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") regarding the effects of adoption of the new regulations on animal and plant species protected under the ESA that inhabit the national forests and by failing to ensure that the adoption of the 2008 Rule is not likely to jeopardize the continued existence of any ESA-protected species or result in the destruction or adverse modification of any such species' critical habitat. 16 U.S.C. § 1536(a)(2).

8. If plaintiffs prevail on the merits of their claims, they intend to seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered Species Act, 16 U.S.C. § 1540(g)(4).

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

9. Plaintiffs bring this action pursuant to the APA, 5 U.S.C. §§ 701-706, and the ESA, 16 U.S.C. § 1540(g). This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §

1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28

U.S.C. §§ 2201-02.  An actual controversy exists between plaintiffs and defendants.

10.     Pursuant to the requirements of the ESA, plaintiffs provided notice of their intention

to bring suit regarding defendants' violation of their legal duties under the ESA as set forth in this

complaint by a letter delivered on April 25, 2008 to the offices of the Secretaries of Agriculture,

Interior, and Commerce, the Chief of the Forest Service, and the Directors of FWS and NMFS.  16

U.S.C. § 1540(g)(2)(A)(i).  A copy of this letter is attached to this complaint as Exhibit A.  More

than sixty days have elapsed since this letter was served on these parties.  Defendants' violations of

the ESA complained of in the letter are continuing and have not been cured.

11.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e) because plaintiff

Sierra Club is incorporated in this district and maintains its headquarters in the County of San

Francisco.  Moreover, more than 1.5 million acres of national forest lands lie within the Northern

District of California.

12.     Assignment to the Oakland Division of this judicial district is proper because there

are national forests in the counties of Del Norte, Humboldt, and Mendocino.  Civil L. R. 3-2(c), (d).

**PARTIES**

13.     Plaintiff Defenders of Wildlife ("Defenders") is a non-profit conservation

organization founded in 1947 and based in Washington, D.C., with offices across the country.

Defenders has more than 530,000 members across the nation.  Defenders is dedicated to protecting

and restoring all native wild animals and plants in their natural communities.

14.     Plaintiff Sierra Club is a non-profit conservation organization founded in 1892, with

headquarters in San Francisco, California, and more than 1,300,000 members and supporters

nationwide.  The mission of the Sierra Club is: "To explore, enjoy and protect the wild places of the

earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to

educate and enlist humanity to protect and restore the quality of the natural and human

environments."

15.     Plaintiff The Wilderness Society ("TWS") is a non-profit environmental organization

founded in 1935, with its headquarters in Washington, D.C.  TWS has approximately 200,000

1    members and nine regional offices.  TWS works to protect America's wilderness and inspire people

2    to care for wild places.  Protecting national forest areas is vital to achieving TWS's mission.

3         16.    Plaintiff Vermont Natural Resources Council ("VNRC") is a non-profit conservation

4    organization founded in 1963, representing approximately 5,000 members who support the

5    protection and maintenance of the ecological health and integrity of Vermont's natural resources,

6    including the Green Mountain National Forest.  Maintaining the diversity of species in Vermont,

7    protection of sensitive ecological areas, maintaining intact blocks of forestland, and promoting

8    sustainable forestry are key conservation components in VNRC's forest program.

9         17.    All of the plaintiff organizations commented on both the rulemaking that led to the

10   2008 Rule and on the inadequacies of the draft EIS on the 2008 Rule.  Plaintiffs Defenders, Sierra

11   Club, and TWS also informed their members of and encouraged them to participate in the

12   rulemaking process.

13        18.    Plaintiffs and their members use the lands in the National Forest System for

14   recreational, scientific, aesthetic, conservation, and commercial purposes.  Plaintiffs and their

15   members have a strong interest in the environmental protections afforded to national forest lands by

16   the NFMA and by the Forest Service's prior NFMA regulations, which regulations defendants have

17   sought to rescind and replace through the rulemaking challenged in this case.  This strong interest

18   includes an interest in those provisions of the 1982 Rule containing standards that, among other

19   things, required the NFMA-required plan for each unit of the National Forest System ("forest plan")

20   to provide for maintaining viable populations of existing native and desired non-native vertebrate

21   species, required the identification and monitoring of "management indicator species" as indicators

22   of the health of forest ecosystems, proscribed management practices within 100-foot buffer zones

23   around water bodies to protect water conditions and fish habitat, required wildlife habitat needs to be

24   accounted for in grazing decisions, and provided detailed guidance for identifying national forest

25   lands not suitable or appropriate for timber production.  Similarly, plaintiffs have a strong interest in

26   parallel provisions of the 2000 NFMA Regulations, under which no forest plan has been

27   promulgated or revised to date, which the 2008 Rule is also intended to supplant.  These provisions

28   include requirements that forest plans provide a high likelihood that habitat conditions will support

viable populations of all native and desired non-native species of all taxa, that "focal species" indicative of the integrity of the larger ecosystems they inhabit will be identified and monitored, that the first priority for national forest management is to maintain and restore ecological integrity of the national forests, and that detailed information will be gathered on a variety of resources to assist in maintaining and restoring ecological integrity.

19.     Plaintiffs and their members seek to view, study, hunt, fish, and otherwise enjoy wildlife and signs of the presence of wildlife, including rare, imperiled, and sensitive wildlife species, in the national forests; to benefit from healthy national forest watersheds, which they use and rely upon for drinking water, swimming, fishing, boating, aesthetic appreciation, and other activities; to observe and study trees and other national forest plant life, and to gather fruits, nuts, and other wild plant materials as permitted in the national forests; and to enjoy the natural scenery of the national forests.  The elimination of resource protection standards effected by the 2008 Rule threatens plaintiffs' and their members' interests in all of these uses of and benefits from ecologically healthy national forests.  Further, plaintiffs and their members have a procedural interest in influencing national forest management through participation in the development of meaningful, substantive forest plans as prescribed by the NFMA.

20.     The above-described recreational, scientific, aesthetic, conservation, consumptive, participatory, and commercial interests of plaintiffs and their respective members have been, are being, and, unless the relief prayed for in this complaint is granted, will continue to be adversely affected and irreparably injured by defendants' violations of NEPA and the ESA, as described below.  In particular, defendants' challenged actions injure plaintiffs and their members by eliminating substantive, enforceable environmental requirements of the NFMA Regulations that govern both the formulation of forest plans and site-specific projects and actions within the National Forest System.  Plaintiffs' and their members' procedural interest in participating in the development, amendment, and revision of forest plans is injured by the 2008 Rule's rendering public input effectively meaningless by converting previously binding forest plans into largely discretionary documents irrelevant to forest management activities on the ground, effectively allowing any forest plan developed with public involvement to be readily amended to accommodate

inconsistent timber sales and other projects.  Moreover, plaintiffs' and their members' procedural interests are injured by the 2008 Rule's strong encouragement to the Forest Service officials responsible for revising forest plans to perform such revisions without the preparation of an environmental review document pursuant to NEPA, on the assertion that forest plans are paper exercises with no impacts on forest resources.  This would deny plaintiffs and their members detailed information on the potential environmental effects of a proposed revised forest plan, the careful examination and comparison of alternatives to that plan, the formulation of measures to mitigate the revised plan's adverse impacts, and an opportunity to comment on all of these matters.

21.  Defendants' failure to comply with NEPA in the promulgation of the 2008 Rule, by preparing a grossly inadequate environmental impact statement containing no analysis of the potential environmental impacts of the 2008 Rule or of the alternatives to that rule, injures plaintiffs and their members by denying them the information that NEPA requires about those potential impacts — direct, indirect, and cumulative with other actions — of the new rule, about environmentally superior alternatives to that rule, and about mitigation measures available to address the significant impacts identified; by denying them any meaningful opportunity to comment on the missing information; and by denying them the procedural safeguards embodied in NEPA to ensure that government agencies carefully consider the environmental consequences of a proposed action, environmentally superior alternatives to that action, and appropriate mitigation measures prior to granting any project approval.  All of the injuries alleged in this and the preceding paragraph are actual and concrete injuries caused by the defendants' failure to comply with their duties under NEPA.

22.  Defendants' failure to comply with the ESA in the promulgation of the 2008 Rule, in preparing a perfunctory biological assessment that fails to look at any of the effects that stripping mandatory protective provisions of prior NFMA Regulations may have on ESA-protected species and thereby failing to perform their duty to ensure that the promulgation of the 2008 Rule is not likely to jeopardize listed species or destroy or adversely modify their critical habitat, injures plaintiffs and their members by denying them the protections that the ESA mandates for the many listed species that inhabit the national forests.  The injuries alleged in this paragraph are actual and

concrete injuries to plaintiffs and their members caused by defendants' failure to comply with their duties under the ESA.

23.     Plaintiffs have no adequate remedy at law to address any of the foregoing injuries to their interests.

24.     Defendant Ed Schafer is the Secretary of the U.S. Department of Agriculture. Defendant Schafer is sued in his official capacity.

25.     Defendant Gail Kimbell is the Chief of the U.S. Forest Service, an agency within the U.S. Department of Agriculture. Defendant Kimbell is sued in her official capacity.

26.     Defendant U.S. Forest Service is an agency within the U.S. Department of Agriculture that is charged with administration of the National Forest System.

### THE NATIONAL FOREST SYSTEM

27.     The 193-million-acre National Forest System encompasses over 8 percent of the geographic area of the United States and includes 155 national forests and 20 national grasslands in 42 states and the Commonwealth of Puerto Rico.

28.     The National Forest System provides many natural assets for the use and enjoyment of all Americans and visitors from around the globe. Stretching from the Pacific to the Atlantic, from Alaska in the north to Puerto Rico in the south, the National Forest System contains a spectacular array of landscapes, including boreal forests, remnants of the prairie grasslands that once carpeted the interior of the continent, temperate and tropical rain forests, towering mountain ranges, eastern hardwood forests, and bald cypress swamps, among many others. These natural landscapes are used and enjoyed by millions of visitors every year for sightseeing, hiking, wildlife observation, winter sports, mountaineering, camping, biking, picnicking, and numerous other activities.

29.     National forests harbor much of the nation's biological diversity. They are home to more than 3,000 species of birds, mammals, reptiles, fish, and amphibians, and more than 10,000 plant species, including more than 400 species listed as endangered or threatened under the ESA (over 250 animal species and over 160 plant species), and more than 2,000 species designated as sensitive. National forests have significantly more intact populations of rare species than any other system of public lands in the United States.

30.    Importantly, national forests also encompass a broad array of ecosystems and habitat types, including large blocks of relatively unfragmented habitats that are critical to the continued existence of many of the large mammals that still persist in the United States, including grizzly bears, wolves, wolverines, lynx, elk, and bighorn sheep.  Accordingly, preserving existing wildlife populations in the National Forest System ensures preservation of some of the rarest and most revered wildlife species remaining in our nation.

31.    The headwaters of many of the nation's rivers are located within the National Forest System, and the water that national forest watersheds provide is critical to drinking water supplies for many communities, fisheries, and domestic, agricultural, and industrial uses.  National forest streams, rivers, ponds, and lakes also provide a popular source of recreation, including boating, swimming, fishing, and aesthetic enjoyment.

## THE NATIONAL FOREST MANAGEMENT ACT

32.    Congress enacted the National Forest Management Act in 1976 to reform Forest Service management of the National Forest System, primarily by requiring stronger protection of non-timber resources, including wildlife, plants, water, and soils; by constraining the use of clearcutting and other harmful logging methods; and by requiring greater opportunities for public participation in national forest management.

33.    The NFMA implements its Forest Service reforms through a system of land management planning for the National Forest System.  The NFMA provides that "the Secretary shall in accordance with the procedures set forth in section 553 of Title 5, promulgate regulations . . . that set out the process for the development and revision" of land management plans for the National Forests, *i.e.*, forest plans, and further set out "the guidelines and standards prescribed by this subsection."  16 U.S.C. § 1604(g).

34.    The NFMA specifically requires the promulgation of NFMA Regulations specifying guidelines for forest plans that address a variety of specific resource management issues.  16 U.S.C. § 1604(g)(3).  Among the explicit mandates of this subsection of the NFMA are regulations specifying guidelines that provide for the diversity of plant and animal communities in each national forest (§ 1604(g)(3)(B)); that restrict timber harvesting to avoid irreversible damage to soils, slopes,

1    and watersheds and detrimental changes to waterways, wetlands, and riparian areas (§

2    1604(g)(3)(E)); that restrict the use of clearcutting and other even-aged timber harvest methods (*i.e.*,

3    harvest methods that result in a replacement stand of trees of identical age) and limit the size and

4    regulate the shape of areas harvested by even-aged methods (§ 1604(g)(3)(F)); and that require the

5    identification of the suitability of national forest lands for resource management (§ 1604(g)(2)(A)).

### THE 1982 NFMA RULE

6

7        35.    The Forest Service promulgated regulations pursuant to the NFMA's statutory

8    mandate on September 30, 1982.  *See* National Forest System Land and Resource Management

9    Planning, 47 Fed. Reg. 43,026 (Sept. 30, 1982) (formerly codified at 36 C.F.R. pt. 219; cited here as

10   "1982 Rule § __").  The 1982 Rule covers five major areas of the national forest planning process.

11   First, it describes the content and role of "regional guides," which establish regional standards and

12   guidelines for the nine regional divisions of the National Forest System.  *See* 1982 Rule §§

13   219.4(b)(2), 219.9.  Second, it establishes a process for developing plans for individual

14   administrative units of the National Forest System, *i.e.*, the various national forests and national

15   grasslands.  *See id.* § 219.12.  Third, it establishes guidelines for determining where and how much

16   logging can occur in the National Forest System.  *See id.* §§ 219.14, 219.16.  Fourth, it states

17   specific planning requirements for a variety of resources, including wilderness, wildlife, grazing,

18   recreation, minerals, water, and soil.  *See id.* §§ 219.18-.25.  Fifth, it establishes "minimum specific

19   management requirements" for logging and other activities.  *See id.* § 219.27.

20       36.    The 1982 Rule was promulgated based on the recommendations of an appointed

21   Committee of Scientists, specifically mandated by the NFMA.  16 U.S.C. § 1604(h).  The

22   Committee of Scientists, made up of members from outside the Forest Service who were experts in

23   various sciences relevant to national forest resources, convened a series of public meetings across

24   the country.  On the basis of their collective expertise and the public input received, the Committee

25   of Scientists made recommendations to the Forest Service regarding the appropriate content of the

26   NFMA Regulations.

27       37.    The 1982 Rule established numerous important environmental safeguards for the

28   national forests.  For example, it proscribed management practices within 100-foot buffer zones

around riparian areas that would "seriously and adversely affect water conditions or fish habitat" (1982 Rule § 219.27(e)); required that wildlife habitat needs be taken into account in decisions regarding livestock grazing (*id.* § 219.20); required management prescriptions to preserve and enhance the diversity of plant and animal communities so that diversity is at least as great as that of a natural forest (*id.* § 219.27(g)); and provided detailed standards and procedures for identifying national forest lands not suitable or appropriate for timber production and for identifying timber management intensities on lands that may be suitable for logging (*id.* § 219.14).

38. With respect to wildlife, the 1982 Rule established a critical protection mandate to implement the NFMA diversity requirement for the National Forest System. The drafters of the 1982 Rule recognized that, in order to sustain plant and animal communities in the national forests, the Forest Service must maintain the individual species that make up those communities. The 1982 Rule therefore provides that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." *Id.* § 219.19; *see also id.* § 219.27(a)(6) (requiring Forest Service to "[p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species"). It defines a "viable population" as "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area" and specifies that "habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area." *Id.* § 219.19. Further, the 1982 Rule specifically requires that forest plans set objectives for ESA-listed species "that shall provide for, where possible, their removal from listing…through appropriate conservation measures, including the designation of special areas to meet the protection and management needs of such species." *Id.* § 219.19(a)(7).

39. To implement the "viability" requirement, the 1982 Rule adopted a "canary in the coal mine" approach. It provided that certain wildlife species must be selected by the Forest Service and monitored as proxies for the health of broader wildlife populations and of the specific ecosystems these species inhabit. Monitoring these proxy species enables the Forest Service to determine whether its management activities are having adverse impacts on wildlife and ecosystems

without the necessity of monitoring all species occupying the forest.  Specifically, the 1982 Rule provides that "certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species" based upon a finding that "their population changes are believed to indicate the effects of management activities."  *Id.* § 219.19(a)(1).  The rule further provides that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined."  *Id.* § 219.19(a)(6).  It also requires that forest plans must provide that habitat for management indicator species is "maintained and improved to the degree consistent with multiple-use objectives."  *Id.* § 219.27(a)(6).  The wildlife viability and management indicator species rules are second only to the Endangered Species Act in their importance as a federal protection for species conservation and are an important complement to the ESA in that they help identify and correct species declines before the emergency measures of the ESA are needed.

40.     By its express terms, the 1982 Rule's specific management requirements apply not only to the development, revision, and amendment of forest plans, but also to the implementation of forest plans through specific projects and actions.  *Id.* § 219.27.

41.     However, since adopting the 1982 Rule, and forest plans pursuant to it, the Forest Service frequently failed to comply with its provisions, particularly with respect to the regulatory requirement that the agency obtain data necessary to determine population trends of management indicator species and their relationships to habitat changes caused by national forest management activities.  As a result, numerous federal courts have invalidated decisions by the Forest Service to undertake site-specific logging and other environmentally harmful projects in the National Forests in the absence of such data and well-founded determinations.  *See, e.g., The Land Council v. Powell*, 379 F.3d 738 (9th Cir. 2004), *amended* 2005 U.S. App. LEXIS 1153 (9th Cir. 2005); *Utah Environmental Congress v. Bosworth*, 372 F.3d 1219 (10th Cir. 2004); *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002); *Sierra Club v. Martin*, 168 F.3d 1, 7 (11th Cir. 1999); *Forest Guardians v. U.S. Forest Service*, 180 F. Supp. 2d 1273 (D.N.M. 2001); *Utah Environmental Congress v. Zieroth*, 190 F. Supp. 2d 1265 (D. Utah 2002).

42.    Thus, the 1982 Rule's wildlife requirements have acted as a significant check upon the Forest Service when the agency has attempted to implement environmentally harmful projects without taking the basic steps required by the rule to ensure that its actions are not pushing resident wildlife populations past the point of viability.

**THE 2000 NFMA RULE**

43.    Since promulgation of the 1982 NFMA Regulations, the Forest Service has initiated several attempts to revise them.  All such attempts were abandoned due to controversy until, in late 1997, then-Secretary of Agriculture Dan Glickman convened a new independent Committee of Scientists, as expressly authorized by the NFMA, to provide guidance to the Forest Service on how to revise and update the NFMA Regulations.  16 U.S.C. § 1604(h)(1).  Like the earlier Committee of Scientists, this group convened a series of meetings across the country in 1998 to invite public participation in their deliberations.  In March 1999, the Committee provided the Forest Service a 193-page set of recommendations regarding potential revisions to the NFMA regulations.  Taking the Committee of Scientists' recommendations into account, the Forest Service published a proposed rule revising the NFMA regulations on October 5, 1999 (64 Fed. Reg. 54,074) and adopted a final rule on November 9, 2000.  *See* National Forest System Land and Resource Management Planning, 65 Fed. Reg. 67,514 (formerly codified at 36 C.F.R. pts. 217 and 219).

44.    The 2000 Rule established detailed provisions for managing wildlife and other resources in the national forests, including revisions to the wildlife "viability" provision of the 1982 NFMA Regulations that retained the species viability approach.  The rule requires that forest plan decisions affecting species diversity must provide for ecological conditions that provide a high likelihood of supporting viable populations of "native and desired non-native species well distributed throughout their ranges within the plan area."  2000 Rule, former 36 C.F.R. § 219.20(b)(2)(i) (cited hereafter as "2000 Rule § __").  Where circumstances prevent meeting this standard of "high likelihood" that the viability of a given species will be adequately protected, the 2000 Rule still requires actions protective of that species' viability.  2000 Rule § 219.20(b)(2)(ii)-(iv).

45.    The 2000 Rule included wildlife monitoring requirements akin to the management indicator species requirements of the 1982 Rule.  It called for identification and monitoring of "focal

species," any given species to be so designated because "its status and trend provide insights to the integrity of the larger ecological system to which it belongs." *Id.* § 219.36. Under the 2000 Rule, monitoring "must be used to evaluate focal species" by monitoring the "status and trends of ecological conditions known or suspected to support" these species. *Id.* § 219.11(a)(1)(ii)(A). It also provided for population monitoring of focal species. *Id.* § 219.11(a)(1)(ii)(B), (C).

46. The 2000 Rule required that forest plans "must provide for implementing actions in conservation agreements…that provide a basis for not needing to list species" and "should reflect the unique opportunities that National Forest System lands provide to contribute to recovery of listed species." *Id.* § 219.20(b)(3)(i).

47. The 2000 Rule required that the "first priority for stewardship of the national forests and grasslands is to maintain and restore ecological sustainability." *Id.* § 219.19. To ensure that this priority is met, the 2000 Rule required "the development and analysis of information regarding [ecosystem diversity and species diversity, identified as 'components of ecological sustainability'] at a variety of temporal and spatial scales." *Id.* § 219.20(a). The scales at which information is to be developed and analyzed include geographic areas such as bioregions and watersheds, scales of biological organization such as communities and species, and scales of time from months to centuries. *Id.* The 2000 Rule requires the Forest Service, in carrying out its duties to promote ecological sustainability in the forest planning process, to develop detailed information regarding the national forest's major vegetation types, water resources, soils, air resources, and species. *Id.* § 219.20(a)(1). It sets out a detailed list of factors to be evaluated in determining how to protect and restore ecosystem and species diversity, including the effects of human activities, the effects of air quality, the effects of uses of water, the quantity and quality of water needed to support ecosystem diversity and ecological sustainability, and the current viability of existing species . *Id.* § 219.20(a)(2). The 2000 Rule also details how all of this information is to be used in making forest plan decisions that affect ecosystem diversity, species diversity, and ESA-listed species. *Id.* § 219.20(b).

48. The 2000 Rule provides that: "The regulations in this subpart [*i.e.*, the 2000 Rule itself]…guide the selection and implementation of site-specific actions." *Id.* § 219.1(a).

1

## THE 2005 NFMA RULE

2      49.      As matters turned out, the 2000 Rule never replaced the 1982 Rule as the basis for

3    developing or revising forest plans.  A new administration assumed control of the Forest Service

4    shortly after publication of the 2000 Rule.  That administration decided to craft its own set of NFMA

5    Regulations to replace the 2000 Rule and the 1982 Rule.  On May 17, 2001, the Secretary of

6    Agriculture postponed the effective date upon which the 2000 Rule would apply to the amendment

7    or revision of land management plans, observing that this postponement would allow the Forest

8    Service to review the regulations and determine whether adjustments were necessary in light of

9    allegedly difficult-to-implement provisions. *See* 66 Fed. Reg. 27,552 (to be codified at 36 C.F.R.

10   219.35(b)).  On May 20, 2002, the Forest Service published an "interim final rule" in the Federal

11   Register that provided that, until revised NFMA Regulations were promulgated, Forest Service

12   officials could continue to conduct forest plan amendments or revisions under the 1982 Rule if they

13   so chose, rather than under the 2000 Rule.  67 Fed. Reg. 35,431-34.  Not a single national forest

14   chose to revise or amend its forest plan under the 2000 Rule.  *See* 70 Fed. Reg. at 1022.

15      50.      On December 6, 2002, the Forest Service published a new set of proposed NFMA

16   regulations, a significant revision of the 2000 Rule ("2002 Proposed Rule").  *See* National Forest

17   System Land and Resource Management Planning, 67 Fed. Reg. 72,770 (Dec. 6, 2002) (to be

18   codified at 36 C.F.R. pt. 219).  At no time prior to proposing the significant revisions encompassed

19   by the 2002 Proposed Rule did the administration appoint a new Committee of Scientists or formally

20   consult with the previous committee, nor did it do so during the remainder of the protracted

21   rulemaking process that followed.  The potential environmental impacts of the 2002 Proposed Rule

22   were not analyzed pursuant to NEPA, based on an assertion that the promulgation of these

23   regulations could be categorically excluded from NEPA review.  67 Fed. Reg. at 72,793.

24      51.      On December 22, 2004, more than two years after publication of the proposed rule,

25   the Forest Service announced the completion of its final set of new NFMA Regulations.  The 2005

26   Rule, along with related materials, was published in the Federal Register January 5, 2005.  *See*

27   National Forest System Land and Resource Management Planning; Removal of 2000 Planning Rule;

28   National Environmental Policy Act Documentation Needed for Developing, Revising, or Amending

Land Management Plans; Categorical Exclusion; Final Rules and Notice, 70 Fed. Reg. 1021.  The

material published in the Federal Register included a final rule rescinding the 2000 Rule by

removing it from 36 C.F.R. part 219, subpart A, with a stated effective date of January 5, 2005 (*Id.* at

1022-23); the final 2005 NFMA Rule, also with a stated effective date of January 5, 2005, and a

lengthy preamble to the new regulations (*id.* at 1023-61); and a proposed categorical exclusion from

the requirements of NEPA for the future development, revision, or amendment of forest plans (*id.* at

1062-66; proposed for inclusion in Forest Service Handbook 1909.15, Chap. 30).  The Federal

Register notice further revealed that the Forest Service did not consult with federal wildlife

protection agencies regarding the potential effects of the new rule on federally-listed endangered and

threatened species, as required by the ESA, based on an assertion that the rule "simply establishes a

process for planning," purportedly without any potential effects on listed species.  *Id.* at 1035.

     52.    The 2005 Rule differed substantially from the 2002 Proposed Rule upon which public

comment had been sought in a variety of ways that the public could not have foreseen from the

content of the proposed rule.  While the 2002 Proposed Rule was characterized in its preamble

materials as an "adjustment" to the 2000 NFMA Rule that retained aspects of those regulations, the

preamble to the 2005 Rule characterized the final regulations as a "paradigm shift" in national forest

land management planning from previous NFMA Regulations.  70 Fed. Reg. at 1024.  The

"paradigm shift" effected by the 2005 Rule was the elimination from the NFMA Regulations of

enforceable substantive standards governing the content of land management plans for the national

forests, including the elimination of a series of standards that the NFMA itself requires be included

in these regulations.  The NFMA requires that "the Secretary shall . . . promulgate regulations . . .

that set out . . . the guidelines and standards prescribed by this subsection."  16 U.S.C. § 1604(g).  In

deleting the NFMA-mandated and other standards from the regulations, the 2005 Rule eliminated the

very word "standard" from the regulations.  The forest plans that the NFMA requires be drafted,

revised, and amended in accordance with the NFMA Regulations were repeatedly characterized in

the 2005 Rule's preamble as "strategic" and "aspirational," rather than "prescriptive," despite the

fact that the NFMA explicitly prescribes a series of resource protection standards that must be

1    included in the NFMA Regulations and reflected in the forest plans formulated pursuant to those

2    regulations.

3        53.    The standards that the NFMA requires be provided in the planning regulations, but

4    that were deleted from the 2005 Rule, encompassed the most fundamental environmental protection

5    requirements that Congress sought to impose in enacting the NFMA.  These deleted standards

6    included a variety of explicit limitations on logging, standards for protecting wildlife diversity, the

7    requirement that specific actions on a national forest be consistent with the forest plan, and the

8    requirement that plan amendments be made with public participation.  The 2005 Rule also

9    eliminated a number of other requirements for environmental protection that were contained in the

10   1982 and/or 2000 Rules, including standards requiring the protection of the viability of individual

11   species, requiring the identification and monitoring of specific species as a measure of ecosystem

12   health, proscribing management activities within 100 feet of water bodies posing damage to water

13   conditions and fish habitat (1982 Rule), and requiring that ecological sustainability be the first

14   priority in forest management (2000 Rule).

15       54.    The 2005 Rule also introduced a novel requirement that every national forest adopt an

16   "environmental management system" ("EMS"), a vaguely defined system of tracking management

17   actions borrowed from the business sector.  *See* 70 Fed. Reg. at 1056 (Jan. 5, 2005), § 219.5.  This

18   requirement does not exist in the 1982 Rule, the 2000 Rule, the 2002 Proposed Rule, or the NFMA

19   itself.  The 2005 Rule made an EMS for each national forest a central part of forest management,

20   requiring all future forest plans, plan revisions, and plan amendments to be completed in accordance

21   with the EMS.  The EMS requirement is intended to supplant the rigorous analysis of the

22   environmental impacts of forest plans required by NEPA.  The NFMA explicitly requires that forest

23   planning comply with NEPA (16 U.S.C. § 1604(g)(1)), and NEPA requires an environmental impact

24   statement on all major federal actions significantly affecting the human environment, 42 U.S.C. §

25   4332(c), including the adoption of plans and guidance documents. 40 C.F.R. § 1508.18(b).  The

26   1982 and 2000 Rules recognized the significant impact forest plans have on the environment and

27   required an EIS on each forest plan adoption or revision.  *See* 1982 Rule § 219.10(b); 2000 Rule §

28   219.9(d).  In contrast, the 2005 Rule was accompanied by a proposal to allow forest plans to be

"categorically excluded" from NEPA analysis on the assertion that these plans have no environmental effects.  36 C.F.R. § 219.4, Notice of proposed National Environmental Policy Act implementing procedures; request for comment, 70 Fed. Reg. 1062-1066 (Jan. 5, 2005) (to be included in Forest Service Handbook 1909.15 Chapters 30.3, 31.2, 32.2).  This proposal has since been adopted, in contravention of NEPA's EIS requirement.  Thus, the 2005 Rule left the public with the standardless EMS process in lieu of the rigorous, well-defined NEPA analysis of environmental effects, alternatives, and mitigation measures, and equally well-defined opportunities for public review and comment, that forest plan EISs provided under the 1982 and 2000 Rules.

55.    Plaintiffs in the instant action challenged the 2005 Rule as having been promulgated in violation of the APA and NEPA.  *Defenders of Wildlife, et al. v Johanns, et al.*, no. 04-4512 PJH, First Supplemental Complaint (N.D. Cal., filed Feb. 17, 2005).  A second case challenging the 2005 Rule also alleged that it had been promulgated in violation of the ESA.  *Citizens for Better Forestry, et al. v. U.S. Dept. of Agriculture, et al.*, no. 05-1144, Complaint (N.D. Cal., filed Mar. 21, 2005).  These cases were consolidated for briefing and argument on motions for summary judgment, and, on March 30, 2007, the District Court ruled that the 2005 Rule had been promulgated in violation of the requirements of the APA, NEPA, and ESA, set aside the regulations, and issued an injunction against their implementation until such time as the statutory violations were cured.  *Citizens for Better Forestry v. USDA*,  481 F.Supp.2d 1089, 1100 (N.D. Cal. 2007).

56.    Following their unsuccessful motion to alter or amend the District Court's summary judgment ruling, federal defendants filed a notice of appeal on August 30, 2007.  However, this appeal and a companion appeal by timber industry defendant-intervenors were voluntarily dismissed through an unopposed motion granted January 14, 2008.

### THE 2008 NFMA RULE

57.    Before abandoning their appeal, defendants republished the 2005 Rule as a proposed rule ("2007 Proposed Rule") on August 23, 2007.  72 Fed. Reg. 48,514 (Aug. 23, 2007).  The public comment period ran until October 22, 2007.  *Id.* at 48,515.  As with the promulgation of the 2005 Rule, the Forest Service did not convene a new Committee of Scientists nor consult with the former committee regarding the proposed rule.  A document entitled Draft Environmental Impact Statement

National Forest System Land Management Planning ("DEIS"), purportedly analyzing the environmental effects of the 2007 Proposed Rule and four alternatives, was published simultaneously with the 2007 Proposed Rule, and public comments on the DEIS were likewise received until October 22, 2007.  *Id.* at i.

58.     The DEIS included four alternatives to the 2007 Proposed Rule for analysis, while eliminating four other potential alternatives suggested by members of the public in response to the notice of intent to prepare an EIS.  DEIS at 13-23.  The four alternatives included were:  Alternative B, the "no action" alternative, which is the 2000 Rule as it existed before promulgation of the 2005 Rule; Alternative C, the 1982 Rule; Alternative D, the 2005 Rule modified to delete the requirements regarding environmental management systems; and Alternative E, the 2005 Rule modified to delete the EMS requirements, to allow forest plans to contain standards, to add direction regarding identification of lands unsuitable for timber harvest, and to add various timber management requirements from the NFMA.  *Id.* at 13-21.

59.     While NEPA requires an EIS to take a "hard look" at the environmental impacts of the proposed action and of the various alternatives considered and provide a fair comparison of the impacts of the alternatives to those of the proposal, the DEIS simply denied that any of the five alternatives considered (including the 2007 Proposed Rule) would have *any* environmental impacts: "The proposed planning rule and the alternatives are all the same in that they would have no direct, indirect, or cumulative impact on the human environment."  *Id.* at 23.  Not surprisingly, given that unfounded denial, the DEIS's comparison of the alternatives to the 2007 Proposed Rule contains no analysis whatsoever of the different levels of impacts the alternatives would have on the resources of the national forests, despite that fact that the alternatives range from the 1982 Rule, with its detailed substantive requirements to protect wildlife and other natural resources, to the standardless 2007 Proposed Rule.  *Id.* at 23-27.  Similarly, all of the other discussions in the short DEIS are premised on the notion that none of the five alternative sets of regulations to govern the management of every acre of the 193-million-acre National Forest System has any direct, indirect, or cumulative impacts on that vast area of public lands.  The DEIS utterly failed to provide the "hard look" at the environmental consequences of the 2007 Proposed Rule that NEPA demands.

60.     On February 7, 2008, the Forest Service released the Final Environmental Impact Statement National Forest Service Land Management Planning ("FEIS").  That document revealed that the final NFMA Regulations to be adopted, called Alternative M in the FEIS, were the 2007 Proposed Rule (*i.e.*, the 2005 Rule invalidated by this Court) modified by the inclusion of broad direction regarding identification of lands unsuitable for timber harvest and of various timber management requirements largely taken verbatim from the NFMA and by a few other minor changes.  FEIS at 26-28.  Except for those modest modifications, Alternative M is substantially identical to the 2005 Rule.  *Id.*  Despite numerous public and agency comments regarding the DEIS's failure to reveal and examine the environmental impacts of the proposed new regulations and the alternatives, the FEIS simply repeated the DEIS's statement that none of the alternatives would have any environmental impacts.  *Id.* at 32.  Like the DEIS, the FEIS offers no analysis of the different environmental impacts likely to result from Alternative M, which is largely devoid of substantive standards, let alone detailed requirements for protection of biological diversity and other natural resources, as compared to the alternatives of the 1982 Rule and the 2000 Rule, which provided such resource protection standards and requirements.

61.     Moreover, while the substantive resource protections in both the 1982 and 2000 Rules directly governed site-specific projects and activities, as well as the content of forest plans (*see* 1982 Rule § 219.27; 2000 Rule § 219.1), Alternative M expressly states that, "[e]xcept as specifically provided, none of the requirements of this subpart apply to projects or activities" (FEIS at D-2 (36 C.F.R. § 219.2(c))) and terminates the application of the provisions of the 1982 Rule to the management of national forests currently operating under forest plans created pursuant to the 1982 Rule (*id.* at D-15 (36 C.F.R. 219.14(b)(4))).  That is, both previous versions of the NFMA Regulations provided standards that directly governed actions on the national forests, while Alternative M negates any such application and nullifies the application of the 1982 Rule to existing forest plans created under its requirements.  Despite this, the FEIS disingenuously concludes that none of the alternatives "dictate[s] how administrative units of the [National Forest System] are to be managed," as support for its overall assertion that none of the alternatives has any environmental impacts.  FEIS at 51.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — 08-2326 CW        21

62.    The 2008 Rule also perpetuates the EMS requirement, in a slightly modified form, as a substitute for the analysis that was formerly provided by EISs on forest plans.  36 C.F.R. § 219.5.

63.    The 2008 Rule allows significant changes to be made in forest plans without treating these as plan amendments for which the NFMA requires public notification and participation.  16 U.S.C. § 1604 (f)(4).  In particular, the 2008 Rule expressly allows the monitoring program and the timber management projections (as well as other resource use projections) in a forest plan to be changed as "administrative corrections," which may be made at any time by Forest Service officials and are not subject to the public participation requirements for plan amendments.  36 C.F.R. § 219.7(b)(3), (4).  Both the monitoring program and timber management projections (i.e., the amount of timber the Forest Service projects can be produced sustainably from the national forest) are central components of a forest plan, components that the public has great interest in because of their importance in guiding management of the national forest.

64.    The Forest Service also prepared a biological assessment for the adoption of the 2008 Rule.  The FEIS on the 2008 Rule, published in February 2008, stated that a BA had been completed and was available for public review at an identified Forest Service website.  However, the BA was not available at that website.  On February 20, 2008, plaintiffs' counsel contacted both Forest Service staff and the Department of Justice counsel who represented the Forest Service in the legal challenges to the 2005 Rule to obtain a copy of the BA but was informed by the latter that the Forest Service, despite its statement in the FEIS that the BA was available for public review, would not make the BA available to the public until the Record of Decision on the 2008 Rule was made.  When the Record of Decision for the 2008 Rule was signed on April 9, 2008, the BA was still not posted for public review.  Posting did not occur until April 11, 2008, after plaintiffs' counsel called Forest Service staff in Washington, D.C. to request access to this document.  The BA is dated January 18, 2008, but was withheld from the public until April 11.

65.    The BA concludes that the 2008 Rule will have "no effect" on endangered or threatened species, on the grounds that the 2008 Rule, "in itself, does not predetermine or compel management activities for specific project areas or land management decisions, nor does it authorize, fund, permit, or carry out any habitat or resource disturbing activities."  Biological Assessment for

Threatened, Endangered, and Proposed Species, and Designated and Proposed Critical Habitat for the National Forest System 2008 Final Land Management Planning Rule (Jan. 18, 2008), p. 4. "The rule does not make any land use allocations, nor does it establish specific standards or guidelines for management of resources." *Id.* This last statement is highly misleading: While the 2008 Rule does not establish "specific standards or guidelines for management of resources," it eliminates prior specific standards for the protection of wildlife and the natural resources upon which wildlife species depend that were contained in the 1982 Rule and the 2000 Rule.

66.     On April 9, 2008, the Forest Service issued a Record of Decision that adopted Alternative M as its final set of revised NFMA regulations. These final regulations, the 2008 Rule, and the Record of Decision were published in the Federal Register on April 21, 2008. 73 Fed. Reg. 21468-512.

67.     In sum, the 2008 Rule, like the 2005 Rule it closely resembles, strips the NFMA Regulations of virtually all detailed substantive standards to protect and guide the management of the National Forest System. This elimination of enforceable standards from the NFMA Regulations without analysis of the environmental impacts of the new regulations that accomplish that elimination, compared to the impacts of the alternatives of the 1982 and 2000 Rules, is a clear violation of NEPA and its implementing regulations. Merely issuing a document entitled "Environmental Impact Statement" that contains none of the required analysis of the environmental impacts of the proposed rule or of any of the alternatives cannot pass muster under NEPA. The Forest Service's elimination of enforceable standards from the NFMA Regulations that provided protection to ESA-listed species and to the natural resources on which these species depend for their survival and recovery, in the absence of any consultation with FWS and NMFS concerning the effects of the loss of these protections on listed species, is a violation of the ESA's requirement that the Forest Service conduct such consultation and ensure that its approval of the 2008 Rule is not likely to jeopardize any listed species or to destroy or adversely modify the designated critical habitat of such species.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CLAIM FOR RELIEF**

**Violation of NEPA and APA:**
**Failure to Prepare Adequate EIS on 2008 NFMA Rule**

68.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

69.    NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement or EIS.  A "major federal action" upon which an EIS may be required includes "new or revised agency rules [and] regulations."  40 C.F.R. § 1508.18(a).  The environmental "effects" that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.  *Id.* § 1508.8.  An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  *Id.* § 1508.7; *see also* § 1508.27(b)(7).

70.    The contents required for an adequate EIS are detailed in 40 C.F.R. part 1502. Among these requirements, an EIS must consider alternatives to the proposed action and "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice" among the alternatives.  *Id.* § 1502.14. The consideration and evaluation of alternatives "is the heart of the [EIS]."  *Id.*  The alternatives analysis must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits."  *Id.* § 1502.14(b).

71.    An EIS must detail the environmental consequences of the alternatives under consideration.  *Id.* § 1502.16.  The examination of environmental consequences "forms the scientific and analytical basis" for the required comparison of alternatives.  *Id.*  The discussion of environmental consequences must include "the environmental impacts of the alternatives including

the proposed action, any adverse environmental impacts that cannot be avoided should the proposal be implemented, the relationship between the short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented." *Id.* The discussion should also include means to mitigate adverse environmental impacts of the project. *Id.* § 1502.16(h).

72.     "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses" in an EIS. *Id.* § 1502.24.

73.     The record of decision on a project for which an EIS is required must specify "the alternative or alternatives which were considered to be environmentally preferable" and state "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted" and, if not, why not. *Id.* § 1505.2(b), (c).

74.     Defendants' approval of the 2008 NFMA Rule, which strips the NFMA Regulations of resource management standards required by the NFMA and contained in prior versions of these regulations, standards that provided concrete protections for natural forests, wildlife and fish, watersheds, and other environmental resources, is undoubtedly a major federal action significantly affecting the human environment within the meaning of 42 U.S.C. § 4332(2)(C) for at least the following reasons:

a.     The National Forest System has a multitude of unique geographic characteristics, including recreation areas, designated wilderness, wild and scenic rivers, and ecologically critical areas within the meaning of 40 C.F.R. § 1508.27(b)(3)

b.     The effects of the 2008 Rule on the quality of the human environment are likely to be "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4);

c.     The possible effects on the human environment involve "unique [and] unknown risks" within the meaning of 40 C.F.R. § 1508.27(b)(5);

d.     The action "may establish a precedent for future actions with significant effects" within the meaning of 40 C.F.R. § 1508.27(b)(6);

e.     The action "may adversely affect an endangered or threatened species or its [critical] habitat" within the meaning of 40 C.F.R. § 1508.27(b)(9); and

f.     The action threatens a violation of federal law imposed for the protection of the environment, namely 16 U.S.C. § 1604(g)(3) of the NFMA, within the meaning of 40 C.F.R. § 1508.27(b)(10).

Consequently, defendants were obligated to prepare an EIS on the 2005 NFMA Rule before approving it.

75.     The FEIS that the defendants prepared for the 2008 Rule violates NEPA in a variety of respects, including but not limited to those described in the following paragraphs.

76.     The FEIS violates NEPA in failing to acknowledge, let alone compare, the impacts of the various alternatives, markedly different regulatory schemes for the management of the National Forest System, on the environments encompassed by that system.  40 C.F.R. § 1502.14.  These regulatory alternatives range from the 1982 Rule, with its detailed substantive requirements for the protection of wildlife and other natural resources and its direct application of these requirements to on-the-ground actions, to the 2008 Rule, which lacks any detailed resource protection standards and is expressly inapplicable to site-specific projects and activities.  The FEIS's unfounded assertion that there is no difference in the environmental impacts that would result from implementation of each of the various alternatives is unsupported by any credible evidence and, indeed, contradicted by the alternatives on their face.  This failure to compare the environmental impacts of the alternatives is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

77.     The FEIS violates NEPA by failing to analyze the direct, indirect, and cumulative impacts of the 2008 Rule and the alternatives, to identify adverse impacts that cannot be avoided if the proposal is implemented, to examine the implications of the proposal's impacts on short-term uses of the environment and the maintenance and enhancement of long-term productivity, and to identify any irreversible or irretrievable commitments of resources, such as loss of species diversity and old growth forests, which the proposal could cause if implemented.  40 C.F.R. § 1502.16.  The unexamined impacts of the 2008 Rule and its alternatives include, but are not limited to, impacts on

1    wildlife, plants, ecosystem diversity and health, water quality and quantity, soils, wildfires, and

2    global climate change. The FEIS's wholesale failure to acknowledge, let alone identify and analyze,

3    environmental impacts of the alternatives is arbitrary, capricious, an abuse of discretion, not in

4    accordance with law, and without observance of procedure required by law within the meaning of

5    the APA, 5 U.S.C. § 706(2).

6         78.     Having failed to analyze environmental impacts, the FEIS has also failed to identify

7    means to mitigate adverse environmental impacts of the 2008 Rule. 40 C.F.R. § 1502.16(h). This

8    failure to identify mitigation measures is arbitrary, capricious, an abuse of discretion, not in

9    accordance with law, and without observance of procedure required by law within the meaning of

10   the APA, 5 U.S.C. § 706(2).

11        79.     The Forest Service has violated NEPA in failing to perform its duty to ensure the

12   professional integrity, including scientific integrity, of the discussions and analyses in the EIS by

13   basing its conclusion that none of the alternatives has any environmental impacts on transparently

14   false statements such as that none of the alternatives "dictate[s] how administrative units of the

15   [National Forest System] are to be managed" (FEIS at 51), when the 1982 and 2000 Rules both

16   expressly apply substantive requirements directly to on-the-ground management of the national

17   forests. *Id.* § 1502.24. The Forest Service's failure to perform its duty to ensure the professional

18   integrity of the discussions and analyses in the EIS is arbitrary, capricious, an abuse of discretion,

19   not in accordance with law, and without observance of procedure required by law within the

20   meaning of the APA, 5 U.S.C. § 706(2).

21        80.     The Forest Service has violated NEPA by issuing a Record of Decision that fails to

22   specify "the alternative or alternatives which were considered to be environmentally preferable" and

23   that further fails to state "whether all practicable means to avoid or minimize environmental harm

24   from the alternative selected have been adopted" and, if not, why not. 40 C.F.R. § 1505.2(b), (c).

25   This failure, which results from the Forest Service's refusal to acknowledge that the alternatives

26   have environmental impacts, is arbitrary, capricious, an abuse of discretion, not in accordance with

27   law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C.

28   § 706(2).

**SECOND CLAIM FOR RELIEF**

**Violation of ESA and APA:**
**Failure to Consult with Wildlife Agencies on 2008 NFMA Rule**

81.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

82.     Section 7(a)(2) of the ESA requires that each federal agency, in consultation with FWS and/or NMFS, ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2). "Action" is defined to include the promulgation of regulations; actions that may directly or indirectly cause modifications to the land, water, or air; and actions that are intended to conserve listed species or their habitat.  50 C.F.R. § 402.02.

83.     A federal agency proposing an "action" ("action agency") must request from FWS and NMFS a list of any threatened or endangered species that may be present in the project area.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.  If threatened or endangered species may be present, the action agency can prepare a "biological assessment" to determine whether the proposed action "may affect" any such species.  50 C.F.R. § 402.12.  If the agency determines that its proposed action "may affect" listed species or critical habitat, the agency must engage in "formal consultation" with FWS and/or NMFS, depending on the species.  *Id*. § 402.14.  Courts have recognized that the "may affect" hurdle is extremely low, encompassing "any possible effect, whether beneficial, benign, adverse, or of an undetermined character."  *Citizens for Better Forestry v. USDA*, 481 F. Supp. 2d 1059, 1091 (N.D. Cal. 2007).  If the biological assessment concludes that the action assessed will not affect any listed species or critical habitat, and the director of FWS and/or NMFS concurs in writing, then formal consultation is not required.  50 C.F.R. § 402.12(j), (k).

84.     Formal consultation culminates with the preparation of a biological opinion by FWS and/or NMFS addressing whether the proposed action will jeopardize threatened or endangered species or result in the destruction or adverse modification of critical habitat and setting forth any necessary measures for avoiding, minimizing, and mitigating any adverse impacts.  *See generally* 16

U.S.C. § 1536(b); 50 C.F.R. § 402.14.  An action agency may avoid formal consultation by engaging in "informal consultation" with FWS and/or NMFS (a separate route from the preparation of a BA) and obtaining their written concurrence that the project is not likely to adversely affect threatened or endangered species or critical habitat.  50 C.F.R. § 402.13(a).  However, the Forest Service may not rely on an arbitrary, capricious, or unsupported "no effects" determination as a basis for failing to comply with Section 7's consultation  and "no jeopardy" and "no adverse modification" requirements.

85.     The Forest Service's promulgation of the 2008 Rule is clearly a federal agency action to which ESA Section 7(a) applies.  "[P]rogrammatic rules such as the 2005 [NFMA Regulations] are covered by ESA's procedural requirements," *i.e.*, the promulgation of NFMA Regulations is an action subject to compliance with Section 7 requirements.  *Citizens for Better Forestry v. USDA*, 481 F. Supp. 2d. at 1097.  The forests and grasslands of the National Forest System provide habitat for more than 250 ESA-listed or proposed endangered and threatened animal species and for more than 160 listed or proposed plant species.  Threatened and Endangered Species on National Forest System Lands, Attachment 1 to BA.  The promulgation of the 2008 Rule may affect these listed species in several ways, and thus formal consultation with FWS and NMFS is mandated by Section 7.

86.     The 2008 Rule eliminates substantive provisions of  both the 1982 Rule and the 2000 Rule that provided for the protection of viable populations of individual wildlife species on the national forests.  The 2008 Rule provides no requirements whatsoever for protecting the viability of every native and desired non-native vertebrate species, as did the 1982 Rule, or of every native and desired non-native species of any taxon, as did the 2000 Rule.  1982 Rule § 219.19; 2000 Rule § 219.20(b)(2).  The 2008 Rule merely contains a vague requirement that the forest plans "must establish a framework to provide the characteristics of ecosystem diversity" and makes specific attention to any individual species wholly discretionary.  36 C.F.R. § 219.10(b).  The elimination of the species viability protections contained in the prior NFMA Regulations undoubtedly may affect ESA-listed and ESA-proposed species, both directly, by removing the benefits of the viability requirement from those species themselves (especially important for proposed species, which have very limited protection under the ESA, but also an important additional safeguard for listed species),

and indirectly, by eliminating the viability requirement for other species upon which the survival and recovery of listed and proposed species depend (*e.g.*, for prey or as components necessary to the health of the ecosystems upon which listed species depend).

87.    The 2008 Rule eliminates substantive provisions of both the 1982 Rule and the 2000 Rule that provided for the population monitoring of individual wildlife species on the national forests.  The 1982 Rule called for the identification of "management indicator species" and monitoring of population trends of these species as an indicator of the effects of forest management activities on wildlife.  1982 Rule § 219.19(a).  The 2000 Rule required identification and monitoring of "focal species," each species so designated because "its status and trend provide insights to the integrity of the larger ecological system to which it belongs."  2000 Rule § 219.36; *see also* § 219.11(a)(1)(ii).  The 2008 Rule's elimination of these species identification and monitoring requirements may affect listed and proposed species both through loss of the important information that would be collected through the monitoring of any listed species designated as a management indicator species or focal species and the loss of information from the monitoring of non-listed focal species that serve as "proxies" for the ecological needs of listed species.

88.    The 2008 Rule eliminates substantive provisions of both the 1982 Rule and the 2000 Rule that required the Forest Service to include provisions in forest plans to aid the recovery of listed species and to prevent the need to list additional species.  1982 Rule § 219.19(a)(7); 2000 Rule § 219.20(b)(3)(i).  The 2008 Rule, which has no non-discretionary, substantive requirements with respect to listed species or their recovery, may affect listed species by its abandonment of prior NFMA regulations specifically promoting listed species' recovery.

89.    The 2008 Rule eliminates substantive provisions of the prior sets of NFMA Regulations that protected forest resources upon which listed and proposed species depend for their survival and recovery.  For example, the 1982 Rule requires that attention be given to wildlife needs in decisions regarding livestock grazing (§ 219.20); proscribes management practices within riparian areas that would "seriously and adversely affect water conditions or fish habitat" (§ 219.27(e)); and requires management prescriptions to preserve and enhance the diversity of plant and animal communities so that diversity is at least as great as that of a natural forest (§ 219.27(g)).  The 2000

1  Rule requires that the "first priority for stewardship of the national forests and grasslands is to

2  maintain and restore ecological sustainability." 2000 Rule § 219.19.  It also requires the Forest

3  Service, in carrying out its duties to promote ecological sustainability, to develop detailed

4  information regarding the national forest's biological, water, soil, and air resources.  *Id.* § 219.20(a).

5  Finally, the 2000 Rule details how this information is to be used in making forest plan decisions that

6  affect ecosystem diversity, species diversity, and ESA-listed species.  *Id.* § 219.20(b).  The 2008

7  Rule's deletion of these and other substantive requirements that protect various natural resources

8  upon which wildlife species depend for their existence may affect species listed as endangered or

9  threatened, and species proposed for listing, by denying them the benefits of such protective

10  requirements.

11          90.      In sum, the 2008 Rule's wholesale removal of the prior rules' protective standards

12  relating directly to individual species and to the natural resources upon which such species rely for

13  survival may affect many, and likely all, of the over 400 listed species that inhabit the national

14  forests and grasslands.  Clearly, this regulatory retreat will negatively affect these species' prospects

15  for survival and recovery.  That being the case, the Forest Service has violated ESA Section 7 by

16  failing to engage in formal consultation with FWS and NMFS regarding the effects of adoption of

17  the 2008 Rule on listed species and to ensure that the 2008 Rule does not jeopardize listed species or

18  destroy or adversely modify critical habitat that has been designated for these species.  These

19  failures, which result from the Forest Service's refusal to acknowledge that the 2008 Rule's

20  elimination of substantive requirements for the protection of wildlife and other natural resources

21  from the NFMA Regulations may affect ESA-listed species, are arbitrary, capricious, an abuse of

22  discretion, not in accordance with law, and without observance of procedure required by law within

23  the meaning of the APA, 5 U.S.C. § 706(2).

                              **REQUEST FOR RELIEF**

24          Therefore, plaintiffs request that this Court:

25          1.      Hold unlawful and set aside the defendants' April 21, 2008 rulemaking pursuant to 5

26  U.S.C. § 706;

2.     Enter a declaratory judgment that the defendants violated the National Environmental Policy Act and its implementing regulations and the Administrative Procedure Act in promulgating the 2008 Rule and that the EIS on the 2008 Rule is legally inadequate;

3.     Enter a declaratory judgment that the defendants violated Section 7 of the Endangered Species Act and its implementing regulations and the Administrative Procedure Act in promulgating the 2008 Rule without consulting with FWS and NMFS regarding the rule's effects on listed species;

3.     Enjoin the defendants from applying or otherwise relying upon the April 21, 2008 rulemaking;

4.     Award plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

5.     Grant plaintiffs such further and additional relief as the Court may deem just and proper.

DATED:  June 26, 2008                    Respectfully submitted,


                                         /s/ Trent W. Orr
                                         TRENT W. ORR
                                         GREGORY C. LOARIE
                                         TIMOTHY J. PRESO
                                         SIERRA B. WEAVER

                                         Counsel for Plaintiffs

# EXHIBIT A



BOZEMAN, MONTANA   DENVER, COLORADO   HONOLULU, HAWAII
INTERNATIONAL   JUNEAU, ALASKA   NEW YORK, NEW YORK   OAKLAND, CALIFORNIA
SEATTLE, WASHINGTON   TALLAHASSEE, FLORIDA   WASHINGTON, D.C.

April 24, 2008

**<u>Via Federal Express</u>**

Ed Schafer
Secretary of Agriculture
United States Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C.  20250

Dirk Kempthorne
Secretary of Interior
United States Department of the Interior
1849 C Street, N.W.
Washington, DC  20240

Abigail R. Kimbell
Chief, United States Forest Service
United States Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C.  20250-0003

Carlos M. Guiterrez
Secretary of Commerce
United States Department  of Commerce
401 Constitution Ave., N.W.
Washington, DC  20230

James W. Balsiger
Acting Director
National Marine Fisheries Service
1315 East West Highway, SSMC3
Silver Spring, MD  20910

H. Dale Hall
Director
United States Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C.  20240

      Re:    Notice of Violations of the Endangered Species Act in Connection
               With Adoption of the Final Rule for National Forest System Land
               Management Planning, 73 Fed. Reg. 21468 (April 21, 2008), to be
               codified at 36 C.F.R. Part 219.

Dear officials of the action agency and wildlife protection agencies:

      On behalf of Defenders of Wildlife, Sierra Club, The Wilderness Society, and Vermont
Natural Resources Council, we write to notify you of violations of section 7 of the Endangered
Species Act ("ESA"), 16 U.S.C. § 1536(a), in connection with the United States Forest Service's
adoption of a final rule on April 9, 2008, to be codified as 36 C.F.R. Part 219, National Forest
System Land Management Planning (referred to here as "2008 Rule"), which significantly
revises prior regulations governing the management of the National Forest System pursuant to
the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*.  The Forest Service is
violating ESA section 7(a)(2) and its implementing regulations because it has adopted the 2008
Rule – an action that "may affect" species listed as threatened or endangered under the ESA –
without engaging in formal consultation under the Act.  16 U.S.C. § 1536(a)(2).  The Forest
Service also is violating the ESA by failing to insure that its actions will not jeopardize listed

426 17TH STREET, 5TH FLOOR   OAKLAND, CA  94612-2807
T: 510.550.6725   F: 510.550.6749   E: eajusca@earthjustice.org   W: www.earthjustice.org

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 2 of 10

species or adversely modify or destroy critical habitat. *Id.* This letter constitutes notice required by section 11(g) of the ESA, 16 U.S.C. § 1540(g), prior to commencement of legal action.

BACKGROUND

On April 9, 2008, the Forest Service adopted a final rule entitled National Forest System Land Management Planning, to be codified as 36 C.F.R. Part 219. This final rule was published in the Federal Register April 21, 2008, and made effective on that date. 73 Fed. Reg. 21468 (April 21, 2008). The 2008 Rule significantly revises prior regulations at 36 C.F.R. Part 219 governing the management of the national forests under the NFMA. Among other things, it eliminates from 36 C.F.R. Part 219 virtually all detailed requirements regarding wildlife viability, species monitoring, and protection of other forest resources upon which wildlife and plant species depend. Such requirements were contained in previous versions of these regulations, which are explicitly called for by the NFMA to govern planning for and management of the national forests. 16 U.S.C. § 1604(g). Both the 1982 NFMA regulations ("1982 Rule"), which guided national forest management for over two decades, and the 2000 NFMA regulations ("2000 Rule"), which were suspended shortly after their adoption and have never been used for forest plan adoption or revision, contained significantly more, and more detailed, requirements for the protection of wildlife and plant species viability and of other natural resources of the national forests than does the 2008 Rule.[1]

Moreover, the 2008 Rule expressly provides that, for national forest land management plans ("forest plans") promulgated under the 1982 Rule (the great majority of existing forest plans), the 1982 rule "is without effect." 36 C.F.R. § 219.14(b)(4). Thus, the 2008 Rule has the immediate effect of rendering the protective requirements of the 1982 Rule inoperable for existing plans promulgated under, and intended to be consistent with, that rule, leaving only the specifics of the forest plan, without the foundational regulatory requirements upon which those specifics were based. The effects of the abandonment of the substantive protections of prior NFMA planning regulations on the prospects for the survival and recovery of the over 400 listed species that inhabit the national forests and surrounding areas, and on their critical habitat, should have been the subject of a full consultation and biological opinion.

The Forest Service prepared a cursory biological assessment for the adoption of the 2008 Rule that concludes that the 2008 Rule will have "no effect" on endangered or threatened species, on the grounds that the 2008 Rule, "in itself, does not predetermine or compel

---

[1] The predecessor 2005 Rule, to which the 2008 Rule is substantially identical, similarly abandoned the resource protection standards of earlier versions of the regulations. The adoption of the 2005 Rule was held invalid by a federal district court in March 2007. *Citizens for Better Forestry v. USDA*, 481 F. Supp. 2d 1059 (N.D. Cal. 2007). Among other legal infirmities, the court found that the adoption of the 2005 Rule violated section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), because the Forest Service had failed to consult adequately with the federal wildlife protection agencies regarding the potential impacts on listed species of the wholesale elimination of wildlife and other resource protections from the NFMA regulations. *Id.* at 1090-97.

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 3 of 10

management activities for specific project areas or land management decisions, nor does it authorize, fund, permit, or carry out any habitat or resource disturbing activities."  Biological Assessment for Threatened, Endangered, and Proposed Species, and Designated and Proposed Critical Habitat for the National Forest System 2008 Final Land Management Planning Rule (Jan. 18, 2008)[2] ("BA"), p. 4.  "The rule does not make any land use allocations, nor does it establish specific standards or guidelines for management of resources."  *Id.*  This last statement is grossly misleading:  While the 2008 Rule does not establish "specific standards or guidelines for management of resources," it eliminates prior specific standards for the protection of wildlife and the natural resources upon which wildlife species depend.

The Forest Service failed to consult with the Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") to produce a formal biological opinion on the effects on listed and proposed species of the 2008 Rule's elimination of substantive regulatory standards to protect wildlife species and other national forest resources.  Indeed, the agency did not even submit its conclusory BA to these agencies for their concurrence in its "no effect" determination, on the stated basis that FWS and NMFS had concurred with the Forest Service's "no effect" determination for the 2000 NFMA regulations, an entirely different set of regulations promulgated by the previous administration that contained detailed requirements for species protection and monitoring.  *Id.*  Whatever the merits of those concurrences for the adequacy of ESA compliance on the 2000 Rule, they provide no rational basis whatsoever for a conclusion of ESA compliance in the adoption of the 2008 Rule.

### THE FOREST SERVICE IS VIOLATING SECTION 7 OF THE ESA BY FAILING TO ENGAGE IN FORMAL CONSULTATION

I.    Section 7 of the ESA Requires Formal Consultation on a Rulemaking That May Affect Listed Species.

Section 7(a)(2) of the ESA requires that each federal agency, in consultation with FWS and/or NMFS, insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).  "Action" is defined to include the promulgation of regulations; actions that may

---

[2]  The BA is dated January 18, 2008.  The environmental impact statement on the rules, published in early February 2008, stated that the BA had been completed and was available for public review at an identified Forest Service website.  Environmental Impact Statement, National Forest System Land Management Planning (Feb. 2008) ("EIS"), p. 70.  However, the BA was not available at that website.  On February 20, 2008, the undersigned contacted both Forest Service staff and the Department of Justice counsel who represented the Forest Service in the *Citizens for Better Forestry* challenge to obtain a copy of the BA but was told by the latter that the Forest Service, despite its statement to the contrary in the EIS, would not make the BA available until the Record of Decision on the 2008 Rule.  E-mail exchange between Trent W. Orr and Cynthia Huber (2/20-21/08).  When the 2008 Rule and Record of Decision were signed on April 9, 2008, the BA was still not posted for public review.  Posting did not occur until April 11, 2008, after the undersigned called Forest Service staff in Washington, D.C. to request to see the BA.

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 4 of 10

directly or indirectly cause modifications to the land, water, or air; and actions that are intended to conserve listed species or their habitat. 50 C.F.R. § 402.02. "[P]rogrammatic rules such as the 2005 Rule [precursor of the 2008 Rule] are covered by ESA's procedural requirements," *i.e.*, promulgation of the NFMA regulations is an action subject to compliance with section 7 requirements. *Citizens for Better Forestry*, 459 F. Supp. 2d. at 1097.

A federal agency proposing an "action" ("action agency") must request from FWS and NMFS a list of any threatened or endangered species that may be present in the project area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If threatened or endangered species may be present, the federal agency can prepare a "biological assessment" to determine whether the proposed action "may affect" any such species. 50 C.F.R. § 402.12. If the agency determines that its proposed action "may affect" listed species or critical habitat, the agency must engage in "formal consultation" with FWS and/or NMFS, depending on the species. *Id*. § 402.14. Courts have recognized that the "may affect" hurdle is extremely low, encompassing "any possible effect, whether beneficial, benign, adverse, or of an undetermined character." *Citizens for Better Forestry*, 481 F. Supp. 2d at 1091. If the biological assessment concludes that the action assessed will not affect any listed species or their critical habitat, and the director of FWS and/or NMFS concurs in writing, then formal consultation is not required. 50 C.F.R. § 402.12(j), (k).

Formal consultation culminates with the preparation of a biological opinion by FWS and/or NMFS addressing whether the proposed action will jeopardize threatened or endangered species or result in the destruction or adverse modification of critical habitat and setting forth any necessary measures for avoiding, minimizing, and mitigating any adverse impacts. *See generally* 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. An action agency may avoid formal consultation by engaging in "informal consultation" with FWS and/or NMFS (a separate route from the preparation of a BA) and obtaining their written concurrence that the project is not likely to adversely affect threatened or endangered species or critical habitat. 50 C.F.R. § 402.13(a). However, courts have made clear that the Forest Service may not rely on an arbitrary, capricious, or unsupported "no effects" determination as a basis for failing to comply with section 7's consultation and "no jeopardy" and "no adverse modification" requirements. *See, e.g., Lockyer v. United States Dep't of Agriculture*, 459 F. Supp. 2d 874, 911 (N.D. Cal. 2006).

II.     The 2008 Rule "May Affect" Threatened and Endangered Species.

The forests and grasslands of the National Forest System provide habitat for more than 250 ESA-listed or proposed endangered and threatened animal species and for more than 160 listed or proposed plant species, for a total of over 400 species. Threatened and Endangered Species on National Forest System Lands, Attachment 1 to BA. The 2008 Rule may affect any and all of these threatened and endangered species in several ways.

**Loss of species viability requirements:** The 2008 Rule eliminates substantive provisions of prior NFMA regulations that provided for the protection of viable populations of individual wildlife species on the national forests. The 1982 Rule, under which nearly all

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 5 of 10

existing forest plans were adopted and revised, provides that:

> Fish and wildlife habitat *shall be managed to maintain viable populations of
> existing native and desired non-native vertebrate species* in the planning area.
> For planning purposes, a viable population shall be regarded as one which has the
> estimated numbers and distribution of reproductive individuals to insure its
> continued existence is well distributed in the planning area.  In order to insure that
> viable populations will be maintained, *habitat must be provided to support, at
> least, a minimum number of reproductive individuals and that habitat must be
> well distributed so that those individuals can interact with others in the planning
> area.*

1982 Rule, former 36 C.F.R. § 219.19 (emphasis added).

The 2000 Rule also contains detailed substantive requirements for protecting individual
species' viability on the national forests:

> Plan decisions affecting species diversity *must provide for ecological conditions
> that the responsible official determines provide a high likelihood that those
> conditions are capable of supporting over time the viability of native and desired
> non-native species well distributed throughout their ranges within the plan
> area*….

2000 Rule, former 36 C.F.R. § 219.20(b)(2)(i) (emphasis added).  Where circumstances prevent
meeting this standard of "high likelihood" that the viability of a given species will be adequately
protected, the 2000 Rule still requires actions protective of that species' viability.  *Id.*, §
219.20(b)(2)(ii)-(iv).

In contrast, the 2008 Rule provides no requirements whatsoever for protecting the
viability of every native and desired non-native vertebrate species, as did the 1982 Rule, or of
every native and desired non-native species of any taxon, as did the 2000 Rule.  The 2008 Rule
merely contains a vague requirement that the forest plans "must establish a framework to provide
the characteristics of ecosystem diversity" and makes any specific attention to individual species
wholly discretionary for the responsible official.  36 C.F.R. § 219.10(b).

The elimination of the species viability protections contained in the prior NFMA
regulations undoubtedly may affect ESA-listed and ESA-proposed species, both directly, by
removing the benefits of the viability requirement from those species themselves (especially
important for proposed species, which have very limited protection under the ESA, but an
important additional safeguard for listed species, too), and indirectly, by eliminating the viability
requirement for other species upon which the survival and recovery of listed and proposed
species depend (*e.g.*, for prey or as necessary components of a healthy ecosystem).

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 6 of 10

**Loss of species monitoring requirements:**  The 1982 Rule called for the identification of "management indicator species" (or "MIS"), which could be vertebrates, invertebrates, or listed plants, to be "selected because their population changes are believed to indicate the effects of management activities."  1982 Rule, § 219.19(a)(1).  Forest Service staff were to estimate the effects of various timber management practices on MIS based on available scientific information, and measures to mitigate adverse effects identified were to be prescribed where appropriate.  *Id.*  "Population trends for the management indicator species will be monitored and relationships to habitat changes determined."  *Id.*, § 219.19(a)(6).

The 2008 Rule contains no species monitoring requirements of any kind.  Its elimination of the MIS identification and monitoring requirements may affect listed species, a number which are identified as MIS in various existing forest plans.  The elimination of the MIS requirements, coupled with the 2008 Rule's declaration that the 1982 Rule creates no legal obligations for forest plans adopted or revised under the 1982 Rule (36 C.F.R. § 219.14(b)(4)), means that the Forest Service will no longer be required to gather population monitoring data for these species, nor (as has been the case under existing forest plans) will the Forest Service be prevented from implementing site-specific projects if it has not complied with its duty to gather MIS population data.  Moreover, the elimination of the MIS requirement also ends the collection of monitoring data required in the past for non-listed MIS that serve as "proxies" for threatened and endangered species with similar habitat needs.  The 1982 Rule's monitoring requirements for MIS provided information crucial to species protection and an important safety net to ensure that forest planning and site-specific activities are not adversely affecting any species, especially those species already on the brink of extinction.

The 2000 Rule called for identification and monitoring of "focal species," any given species to be so designated because "its status and trend provide insights to the integrity of the larger ecological system to which it belongs."  2000 Rule, § 219.36.

Individual species, or groups of species that use habitat in similar ways or which perform similar ecological functions, may be identified as focal species.  Focal species serve an umbrella function in terms of encompassing habitats needed for many other species, play a key role in maintaining community structure or processes, are sensitive to the changes likely to occur in the area, or otherwise serve as an indicator of ecological sustainability.  Certain focal species may be used as surrogates to represent ecological conditions that provide for viability of some other species, rather than directly representing the population dynamics of those other species.

*Id.*  Under the 2000 Rule, monitoring "must be used to evaluate focal species" by monitoring the "status and trends of ecological conditions known or suspected to support" these species.  2000 Rule, § 219.11(a)(1)(ii)(A).  The 2000 Rule also provides for population monitoring of focal

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 7 of 10

species.  *Id.*, § 219.11(a)(1)(ii)(B), (C).

The 2008 Rule's elimination of the 2000 Rule's focal species identification and monitoring requirements, like its elimination of the MIS requirements, may affect listed and proposed species both through loss of the important information that would be collected through the monitoring of any listed species designated a focal species and the loss of information from the monitoring of non-listed focal species that serve as "proxies" for the ecological needs of listed species.

**Loss of substantive requirements for proactive measures to protect listed species:** The 1982 Rule specifically required that forest plans set objectives for ESA-listed species "that shall provide for, where possible, their removal from listing…through appropriate conservation measures, including the designation of special areas to meet the protection and management needs of such species."  1982 Rule, § 219.19(a)(7).

The 2000 Rule required that forest plans "must provide for implementing actions in conservation agreements with [FWS and NMFS] that provide a basis for not needing to list species" and "should reflect the unique opportunities that National Forest System lands provide to contribute to recovery of listed species."  2000 Rule, § 219.20(b)(3)(i).

The 2008 Rule, which has no non-discretionary, substantive requirements with respect to listed species or their recovery, once again may affect listed species by its abandonment of prior NFMA regulations specifically aimed at promoting listed species' recovery.

**Loss of standards protective of forest resources upon which listed species rely:** Beyond the species-specific requirements of the prior sets of NFMA regulations, these regulations contain other provisions of great value to the protection of listed species on the national forests.  The 1982 Rule sets forth a variety of resource protection standards that safeguard resources of critical importance to listed species.  To give a few examples, the 1982 Rule requires that attention be given to wildlife needs in decisions regarding livestock grazing (§ 219.20); proscribes management practices within riparian areas that would "seriously and adversely affect water conditions or fish habitat" (§ 219.27(e)); and requires management prescriptions to preserve and enhance the diversity of plant and animal communities so that diversity is at least as great as that of a natural forest (§ 219.27(g)).

The 2000 Rule required that the "first priority for stewardship of the national forests and grasslands is to maintain and restore ecological sustainability."  2000 Rule, § 219.19.

The elimination of these and other substantive standards that protect various resources upon which wildlife species depend for their existence may affect listed species by denying them the obvious benefit of such protective requirements.

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 8 of 10

In sum, there can be no serious question whether the 2008 Rule's wholesale removal of the prior rules' protective standards relating directly to individual species and to the natural resources upon which wildlife relies for survival may affect many of the over 400 listed species that inhabit the national forests and grasslands. Clearly, this regulatory retreat will negatively affect these species' prospects for survival and recovery. That being the case, the Forest Service has violated ESA section 7 by failing to engage in formal consultation with FWS and NMFS regarding the effects of adoption of the 2008 Rule on listed species.

III.    The Forest Service's "No Effect" Determination Is Arbitrary and Capricious and Not Based on the Best Available Science.

The Forest Service's determination that the 2008 Rule will have "no effect" on threatened or endangered species is not based on the best available science, is arbitrary and capricious and contrary to law, and may not serve as a basis for failing to comply with section 7 requirements for formal consultation. *See, e.g., Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994) (rejecting Forest Service argument that forest plans do not require consultation because they "do not mandate any action and are 'merely' programmatic documents"). The BA contains no analysis whatsoever of the effects on listed and proposed species of eliminating numerous substantive requirements from the prior NFMA rules that benefited these species. Instead, the BA flatly asserts that the 2008 Rule has no cognizable effects on listed and proposed species, pretending that the new regulations exist in a vacuum and conveniently ignoring their wholesale deletion of the wildlife and resource protections contained in the regulations they supplant. The Forest Service declined even to submit its badly flawed BA on the 2008 Rule to FWS and NMFS to determine whether either agency agreed with its "no effect" determination, stating that it did so in reliance upon the concurrences of these agencies with an earlier "no effect" determination regarding the vastly different 2000 NFMA regulations. BA, p. 4. Putting aside the inappropriateness of those concurrences regarding the effects of the 2000 Rule (which were arbitrarily and capriciously given without analysis or adequate evidentiary support), they offer no rational basis whatsoever to support the Forest Service's "no effect" determination regarding the 2008 Rule.

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 9 of 10

## CONCLUSION

Accordingly, the Forest Service is violating the ESA because it has not engaged in formal consultation, because it has failed to insure that the 2008 Rule is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of critical habitat, and because it has reached its faulty "no effect" determination arbitrarily and capriciously, with no analysis or evidentiary support. If you believe any of the foregoing to be in error or would like to discuss a resolution of this matter prior to litigation, please do not hesitate to call us at (510) 550-6725.

Sincerely,

Trent W. Orr
Gregory C. Loarie
Earthjustice

Sierra B. Weaver
Defenders of Wildlife

*Attorneys for Defenders of Wildlife, SierraClub,*
*The Wilderness Society, and Vermont Natural*
*Resources Council*

cc:    Michael B. Mukasey, United States Attorney General

Secretary Schafer, Chief Kimbell, *et al.*
April 24, 2008
Page 10 of 10

Business Addresses for Named Organizations

Defenders of Wildlife
1130 17th Street, NW
Washington, DC  20036
Tel: 202-682-9400

Sierra Club
85 2nd Street, Second Floor
San Francisco, CA  94105
Tel: 415-977-5500

The Wilderness Society
1615 M St., NW
Washington, DC  20036
Tel: 800-843-9453

Vermont Natural Resources Society
9 Bailey Avenue
Montpelier, VT  05602
Tel: 802-223-2328