1

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
                                         No. C 08-1927 CW
9   CITIZENS FOR BETTER FORESTRY, et al.,

10        Plaintiffs,                     ORDER GRANTING
                                          PLAINTIFFS' MOTION
11     v.                                 FOR SUMMARY JUDGMENT
                                          AND DENYING
12  U.S. DEPARTMENT OF AGRICULTURE, et    DEFENDANTS' CROSS-
    al.,                                  MOTION FOR SUMMARY
13                                        JUDGMENT
          Defendants.
14  _____/

15

16

17       Plaintiffs Citizens for Better Forestry, et al. (collectively,

18  Citizens) charge Defendants United States Department of Agriculture

19  (USDA), et al. with failing to adhere to procedures required by the

20  National Environmental Policy Act (NEPA) and the Endangered Species

21  Act (ESA) when they promulgated regulations that govern the

22  development of management plans for forests within the National

23  Forest System.  The parties now cross-move for summary judgment.

24  The matter was heard on April 2, 2009.  Having considered oral

25  argument and all of the papers submitted by the parties, the Court

26  grants Citizens' motion and denies the USDA's cross-motion.

27                            BACKGROUND

28       The National Forest System includes approximately 193 million

acres of land and is administered by the U.S. Forest Service, an

agency within the USDA.  In 1976, Congress enacted the National

Forest Management Act (NFMA) to reform management of the National

Forests.  The Act established a three-tiered regulatory approach to

forest management, with different tiers existing at the national,

regional and local levels.

At the highest level, the NFMA requires the USDA to promulgate

national uniform regulations that govern the development and

revision of regional and local plans.  16 U.S.C. § 1604(g).

> These regulations mandate the compliance of lower-level
> plans with the National Environmental Policy Act of 1969,
> 42 U.S.C. §§ 4321-4370f ("NEPA"), specifically setting
> forth the circumstances that require preparation of an
> Environmental Impact Statement ("EIS").  16 U.S.C.
> § 1604(g)(1). In addition, they set broad guidelines (to
> be followed when preparing regional and site-specific
> plans) regarding plant and animal species conservation,
> timber management, and water management.  Id.
> § 1604(g)(3).

Citizens for Better Forestry v. U.S. Dep't of Agric. (Citizens I),

341 F.3d 961, 965 (9th Cir. 2003).  The USDA's 2008 revision of

these regulations, which are also known as the "plan development

rule," is at issue in the present lawsuit.

The second tier of National Forest regulation consists of land

resource management plans (LRMPs), also known as forest plans,

which apply to large "units" of the forest system.  16 U.S.C.

§ 1604(a).

> These plans operate like zoning ordinances, defining
> broadly the uses allowed in various forest regions,
> setting goals and limits on various uses (from logging to
> road construction), but do not directly compel specific
> actions, such as cutting of trees in a particular area or
> construction of a specific road.  The content and
> promulgation of these plans must comply with the plan
> development rule.

Citizens I, 341 F.3d at 966.

2

**United States District Court**
For the Northern District of California

1    The third-tier of regulation consists of "site-specific"

2  plans.  These plans "are prepared to effect specific, on-the-ground

3  actions" and "must be consistent with both sets of higher-level

4  rules."  Id. (citing 16 U.S.C. § 1604(i)).

5    The USDA promulgated the first plan development rule in 1979

6  and amended it in 1982.  The 1982 Rule imposed a number of

7  substantive requirements on LRMPs and site-specific plans:

8         This Rule required that "[f]ish and wildlife habitat
          shall be managed to maintain viable populations
9         [thereof]," further defining a "viable" population as
          "one which has the estimated numbers and distribution of
10        reproductive individuals to insure its continued
          existence is well distributed in the [relevant] area."
11        See National Forest System Land and Resource Management
          Planning, 47 Fed. Reg. 43,026, 43,048 (Sept. 30, 1982)
12        (amending 36 C.F.R. part 219).  In addition, the 1982
          Rule required the development of so-called "regional
13        guides," which "provide[d] standards and guidelines for
          addressing major issues and management concerns which
14        need to be considered at the regional level to facilitate
          forest planning." See id. at 43,042 (revising 36 C.F.R.
15        § 219.8-.9).  Furthermore, the Rule contained "minimum
          specific management requirements," setting forth
16        mandatory directives which all regional LRMPs must
          follow, and specific, quantifiable baselines below which
17        no LRMP or site-specific plan can fall. See id. at
          43,050 (creating 36 C.F.R. § 219.27).  These requirements
18        included, inter alia, establishment of 100-foot buffers
          around bodies of water and specific limits on
19        tree-cutting. See id.

20  Citizens I, 341 F.3d at 966 (alterations in original).

21    Under NEPA, federal agencies must issue an EIS in connection

22  with all "major Federal actions significantly affecting the quality

23  of the human environment."  42 U.S.C. § 4332(2)(C).  "In certain

24  circumstances, where it is not clear whether a full EIS is

25  required, agencies prepare a more concise Environmental Assessment

26  [(EA)] to evaluate preliminarily the need to prepare a full EIS."

27  Citizens I, 341 F.3d at 966 n.2 (citing 40 C.F.R. § 1501.4(b)-(c)).

28    In 2000, the USDA amended the 1982 Rule.  The USDA did not

United States District Court
For the Northern District of California

prepare an EIS in connection with the 2000 Rule, but it did prepare an EA. The EA found that the amendment had no significant impact on the environment. Id. at 967.

The 2000 Rule modified its predecessor in a number of ways:

> First, it relaxed the species "viability" requirement by providing that "[p]lan decisions affecting species diversity must provide for ecological conditions that . . . provide a high likelihood that those conditions are capable of supporting over time the viability of . . . species well distributed throughout their ranges within the plan area." National Forest System Land and Resource Management Planning, 65 Fed. Reg. 67,514, 67,575 (Nov. 9, 2000) (amending 36 C.F.R. § 219.20(b)(2)) (emphasis added). The 1982 Rule had more stringently required that the USDA "insure" continued species existence. 47 Fed. Reg. at 43,038. The 2000 Rule also eliminated the requirement of developing and issuing "regional guides" to maintain regional consistency in forest management. See 65 Fed. Reg. at 67,527. It further eliminated many of the "minimum specific management requirements." For example, in comments submitted in response to the draft 2000 Rule, the Environmental Protection Agency ("EPA") observed that "while [the 1982 Rule] contain[s] specific limits on clear cutting [of trees], the proposed [2000 Rule] would require only that individual forest plans 'provide standards and guidelines for timber harvest and regeneration methods,'" and asked "[h]ow will the proposed [2000 Rule] ensure requirements necessary for sustainability?"
>
> Finally, the 2000 Plan Development Rule eliminated the post-decision appeal process of 36 C.F.R. pt. 217, and replaced it with a pre-decision "objection" process. 65 Fed. Reg. at 67,568 (removing 36 C.F.R. pt. 217); id. at 67,578 79 (creating 36 C.F.R. § 219.32). Under this new process, members of the public wishing to object to an amendment or revision of an LRMP have 30 days from the date an EIS is made available to do so. See id. Thus, this process can occur before the finalization of the planned amendment if the EIS is published more than 30 days before the amended LRMP becomes final.

Citizens I, 341 F.3d at 967-68 (alterations in original).

Citizens and other environmental groups sued the USDA, challenging the substance of the 2000 Rule as contrary to the provisions of the NFMA and alleging that, in promulgating the Rule, the agency failed to adhere to procedures mandated by NEPA and the

ESA.  After the lawsuit was filed, the USDA announced its intention to revise the new rule.  The parties agreed to stay Citizens' substantive challenges, but proceeded with the procedural challenges.  The district court granted summary judgment against Citizens on the procedural claims, finding that they were not justiciable for lack of standing and ripeness.  The Ninth Circuit reversed the district court on appeal in <u>Citizens I</u> and remanded the case for further proceedings.  <u>Citizens I</u> was dismissed pursuant to stipulation after remand.

In 2002, the USDA proposed amending the 2000 Rule.  In its notice of proposed rulemaking, it found that, "[a]lthough the 2000 rule was intended to simplify and streamline the development and amendment of land and resource management plans, . . . the 2000 rule [was] neither straightforward nor easy to implement" and "did not clarify the programmatic nature of land and resource management planning."  <u>National Forest System Land and Resource Management Planning</u>, 67 Fed. Reg. 72,770, 72,770 (Dec. 6, 2002).  The proposed rule purported to retain "many of the basic concepts in the 2000 rule, namely sustainability, public involvement and collaboration, use of science, and monitoring and evaluation," but "attempted to substantially improve these aspects of the 2000 rule by eliminating unnecessary procedural detail, clarifying intended results, and streamlining procedural requirements consistent with agency staffing, funding, and skill levels."  <u>Id.</u> at 72772.

The USDA did not publish the final version of the rule it proposed in 2002 until 2005.  <u>National Forest System Land Management Planning</u>, 70 Fed. Reg. 1023 (Jan. 5, 2005).  It did not conduct an EIS or an EA, asserting that the rule fell within a

previously declared "categorical exclusion" to NEPA's requirements. A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required."  40 C.F.R. § 1508.4.  In the USDA's view, the 2005 Rule fell within an existing categorical exclusion that applied to "rules, regulations, or policies to establish Service-wide administrative procedures, program processes, or instruction."  70 Fed. Reg. at 1054.  In addition, the USDA did not consult with the Fish and Wildlife Service (FWS) or the National Marine Fisheries Service (NMFS) to determine whether the 2005 rule would have an adverse effect on any endangered or threatened species.

Citizens and other environmental groups again sued the USDA, claiming procedural violations of NEPA and the ESA.  In Citizens for Better Forestry v. United States Department of Agriculture (Citizens II), 481 F. Supp. 2d 1059 (N.D. Cal. 2007), the district court granted summary judgment in part against the USDA, finding that: 1) the agency had violated the Administrative Procedure Act by promulgating the 2005 Rule -- a self-described "paradigm shift" from earlier rules, including the rule proposed in 2002 -- without first providing notice of the changes and allowing the public to submit comments; 2) the agency had violated NEPA by applying the categorical exclusion and failing to prepare either an EA or an EIS; 3) the agency had violated the ESA by failing to engage in consultations with other federal agencies or to publish a

6

United States District Court
For the Northern District of California

biological assessment (BA).  The court enjoined the USDA from putting the 2005 rule into effect until the agency complied with these statutes.

In 2007, the USDA re-published the 2005 rule along with a draft EIS and sought public comment.  National Forest System Land Management Planning, 72 Fed. Reg. 48,514 (Aug. 23, 2007).  The agency published the final version of the EIS and the rule in 2008. National Forest System Land Management Planning, 73 Fed. Reg. 21,468 (April 21, 2008).  The final version differs in some respects from the proposal, but adheres to the same basic approach to forest plan development.  The EIS was undertaken in an effort to comply with the district court's decision in Citizens II and concluded, as the USDA had concluded previously, that the proposed rule would have no direct or indirect impact on the environment because the rule was programmatic in nature and did not, in itself, effect any predictable changes in the management of specific National Forest sites.  In an effort to comply with the ESA, the USDA also published a BA in connection with the rule's promulgation.  The BA concluded, similarly to the EIS, that the Rule would not have a direct or indirect effect on species protected by the Act.

Citizens and other environmental groups now challenge the 2008 Rule.  They assert that, although the USDA prepared an EIS and a BA in connection with the 2008 Rule, the agency nonetheless violated NEPA and the ESA because the EIS and BA simply repeated the agency's previous erroneous finding that the 2005 Rule would have no effect on the environment or protected species.

United States District Court
For the Northern District of California

1              LEGAL STANDARD

2       Summary judgment is properly granted when no genuine and

3  disputed issues of material fact remain, and when, viewing the

4  evidence most favorably to the non-moving party, the movant is

5  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

6  56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

7  Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

8  1987).

9       The moving party bears the burden of showing that there is no

10  material factual dispute.  Therefore, the court must regard as true

11  the opposing party's evidence, if it is supported by affidavits or

12  other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

13  815 F.2d at 1289.  The court must draw all reasonable inferences in

14  favor of the party against whom summary judgment is sought.

15  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

16  587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

17  1551, 1558 (9th Cir. 1991).

18       Material facts which would preclude entry of summary judgment

19  are those which, under applicable substantive law, may affect the

20  outcome of the case.  The substantive law will identify which facts

21  are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

22  (1986).

23       Where the moving party does not bear the burden of proof on an

24  issue at trial, the moving party may discharge its burden of

25  production by either of two methods:

26       The moving party may produce evidence negating an
          essential element of the nonmoving party's case, or,
27       after suitable discovery, the moving party may show that
          the nonmoving party does not have enough evidence of an
28       essential element of its claim or defense to carry its

8

1    ultimate burden of persuasion at trial.

2    Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d

3    1099, 1106 (9th Cir. 2000).

4    If the moving party discharges its burden by showing an

5    absence of evidence to support an essential element of a claim or

6    defense, it is not required to produce evidence showing the absence

7    of a material fact on such issues, or to support its motion with

8    evidence negating the non-moving party's claim.    Id.; see also

9    Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v.

10   NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).    If the

11   moving party shows an absence of evidence to support the non-moving

12   party's case, the burden then shifts to the non-moving party to

13   produce "specific evidence, through affidavits or admissible

14   discovery material, to show that the dispute exists."    Bhan, 929

15   F.2d at 1409.

16   If the moving party discharges its burden by negating an

17   essential element of the non-moving party's claim or defense, it

18   must produce affirmative evidence of such negation.    Nissan, 210

19   F.3d at 1105.    If the moving party produces such evidence, the

20   burden then shifts to the non-moving party to produce specific

21   evidence to show that a dispute of material fact exists.    Id.

22   If the moving party does not meet its initial burden of

23   production by either method, the non-moving party is under no

24   obligation to offer any evidence in support of its opposition.    Id.

25   This is true even though the non-moving party bears the ultimate

26   burden of persuasion at trial.    Id. at 1107.

27   Where the moving party bears the burden of proof on an issue

28   at trial, it must, in order to discharge its burden of showing that

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   no genuine issue of material fact remains, make a prima facie

2   showing in support of its position on that issue.  UA Local 343 v.

3   Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That

4   is, the moving party must present evidence that, if uncontroverted

5   at trial, would entitle it to prevail on that issue.  Id.  Once it

6   has done so, the non-moving party must set forth specific facts

7   controverting the moving party's prima facie case.  UA Local 343,

8   48 F.3d at 1471.  The non-moving party's "burden of contradicting

9   [the moving party's] evidence is not negligible."  Id.  This

10  standard does not change merely because resolution of the relevant

11  issue is "highly fact specific."  Id.

12                           DISCUSSION

13  I.   Standing and Ripeness

14       Article III of the Constitution limits the jurisdiction of the

15  federal courts to "cases" and "controversies."  In order to satisfy

16  the "case or controversy" requirement, a plaintiff must show that:

17  "(1) he or she has suffered an injury in fact that is concrete and

18  particularized, and actual or imminent; (2) the injury is fairly

19  traceable to the challenged conduct; and (3) the injury is likely

20  to be redressed by a favorable court decision."  Salmon Spawning &

21  Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1225 (9th Cir.

22  2008).  "Article III standing requires an injury that is actual or

23  imminent, not conjectural or hypothetical."  Cole v. Oroville Union

24  High Sch. Dist., 228 F.3d 1092, 1100 (9th Cir. 2000) (internal

25  quotation marks omitted).

26       As noted above, in Citizens I, the Ninth Circuit held that

27  Citizens had standing to assert claims identical in all relevant

28  respects to those here.  The court observed that, when the injury

                                10

United States District Court
For the Northern District of California

complained of is the government's failure to follow prescribed procedures, the plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." 341 F.3d at 969 (quoting Public Citizen v. Dep't of Transp., 316 F.3d 1002, 1015 (9th Cir. 2003)). The "concrete interest" test requires "a geographic nexus between the individual asserting the claim and the location suffering an environmental impact." Id. at 971 (quoting Public Citizen, 316 F.3d at 1015). The Ninth Circuit found that Citizens had satisfied this requirement:

> They have properly alleged, and supported with numerous affidavits covering a vast range of national forests around the country, that their members use and enjoy national forests, where they observe nature and wildlife. The Supreme Court has held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.
>
> Citizens need not assert that any specific injury will occur in any specific national forest that their members visit. The asserted injury is that environmental consequences might be overlooked as a result of deficiencies in the government's analysis under environmental statutes. Were we to agree with the district court that a NEPA plaintiff's standing depends on "proof" that the challenged federal project will have particular environmental effects, we would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake.

Id. at 971-72 (citations and internal quotation marks omitted).

The Ninth Circuit also noted that environmental plaintiffs asserting a procedural injury "can establish standing without meeting all the normal standards for immediacy." Id. at 972 (internal quotation marks and ellipsis omitted). Instead, they need only "establish the reasonable probability of the challenged

action's threat to their concrete interest." Id. (internal
quotation marks and brackets omitted).  The court found that
Citizens had demonstrated a reasonable probability that its
members' "concrete interest in enjoying the national forests" would
be injured because the 2000 Rule eliminated some of the explicit
requirements that were contained in the 1982 rule.  In so finding,
the court rejected the UDSA's argument that, because the rule only
controlled the development of LRMPs and site-specific plans, and
did not have any direct effect on the environment itself, there was
an "insufficient connection between the asserted procedural injury
and the concrete interests at stake." Id. at 973.  The court
reasoned that "[e]ven components of the 2000 Rule that apply
indirectly to site-specific plans will (with reasonable
probability) influence for the worse the environmental safeguards
in LRMPs promulgated thereunder, which in turn will likely result
in less environmental safeguards at the site-specific plan level."
Id. at 975.

     If Citizens I is still good law, it would compel the
conclusion that Citizens has standing to sue in the present case.
The USDA, however, argues that Citizens I was implicitly overruled
by a recent decision of the United State Supreme Court, Summers v.
Earth Island Institute, ___ U.S. ___, 129 S. Ct. 1142 (2009).  As
the Ninth Circuit has held, district courts must not follow circuit
court precedent where a subsequent Supreme Court decision has
"undercut the theory or reasoning underlying the prior circuit
precedent in such a way that the cases are clearly irreconcilable."
Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003).

     Summers involved a challenge to Forest Service regulations

12

implementing the Forest Service Decisionmaking and Appeals Reform Act of 1992 (ARA).  The ARA requires the Forest Service "to establish a notice, comment and appeal process for proposed actions of the Forest Service concerning projects and activities implementing land and resource management plans." <u>Summers</u>, 129 S. Ct. at 1147 (internal quotation marks omitted).  The implementing regulations provided that certain of the ARA's procedures would not be applied to some types of projects.  Specifically, projects that the Forest Service considered categorically excluded from NEPA's requirement to file an EIS or an EA would not be required to comply with the ARA's notice and comment procedures, <u>see</u> 36 C.F.R. § 215.4(a), or the ARA's appeal procedures, <u>see</u> 36 C.F.R. § 215.12(f).  "Later amendments to the Forest Service's manual of implementing procedures, adopted by rule after notice and comment, provided that fire-rehabilitation activities on areas of less than 4,200 acres, and salvage-timber sales of 250 acres or less, did not cause a significant environmental impact and thus would be categorically exempt from the requirement to file an EIS or EA. This had the effect of excluding these projects from the notice, comment, and appeal process." <u>Summers</u>, 129 S. Ct. at 1147.

Following a fire in Sequoia National Forest, the Forest Service announced its decision to undertake the Burnt Ridge Project, a salvage sale of timber on 238 acres of forest land damaged by the fire.  Pursuant to its categorical exclusion, the Service "did not provide notice in a form consistent with the Appeals Reform Act, did not provide a period of public comment, and did not make an appeal process available." <u>Id.</u> at 1148.  Earth Island Institute sued, challenging 36 C.F.R. §§ 215.4(a) and

13

United States District Court
For the Northern District of California

215.12(f).  In addition to these two regulations, Earth Island Institute challenged six other Forest Service regulations that were not applied to the Burnt Ridge Project.

After the district court granted a preliminary injunction, the parties settled their dispute over the Burnt Ridge Project.  Earth Island Institute nonetheless proceeded with its claims, seeking a ruling invalidating the two regulations that had been applied to the project as well as the six regulations that had not.  The district court found that Earth Island Institute had standing to challenge the regulations and that its claims were ripe for review.  The court invalidated five of the eight regulations, including the two that had been applied to the Burnt Ridge Project, and entered a nationwide injunction against their application.

On appeal, the Ninth Circuit found that Earth Island Institute had standing to sue because it had suffered a procedural injury:

> Earth Island was unable to appeal the Burnt Ridge Project because the Forest Service applied 36 C.F.R. § 215.12(f); the loss of that right of administrative appeal is sufficient procedural injury in fact to support a challenge to the regulation.  Plaintiffs in this case are "injure[d] ... in the sense contemplated by Congress," Idaho Conservation League v. Mumma, 956 F.2d 1508, 1516 (9th Cir. 1992); because Plaintiffs are precluded from appealing decisions like the Burnt Ridge Project, and that Project itself, under the 2003 Rule.  The ARA is entirely procedural, and Congress contemplated public involvement in the administrative notice, comment, and appeal process.

Earth Island Institute v. Ruthenbeck, 490 F.3d 687, 694 (9th Cir. 2007).  The court's discussion of standing referred only to § 215.12(f), which had the effect of eliminating Earth Island Institute's right to appeal the Burnt Ridge Project.  It did not address, as a separate matter, the issue of standing with respect to Earth Island Institute's challenge to § 215.12(a), which had the

effect of exempting the Burnt Ridge Project from the ARA's ordinary notice and comment procedures.  Nor did the court specifically address standing with respect to Earth Island Institute's challenge to the six regulations that had not been applied to the project.

The Ninth Circuit also discussed the issue of ripeness.  It found that, because §§ 215.4(a) and 215.12(f) had been applied to the Burnt Ridge Project, these regulations were ripe for review. In the court's view, the parties' agreement to settle the Burnt Ridge timber sale dispute did "not affect the ripeness of Earth Island's challenge to 36 C.F.R. §§ 215.12(f) and 215.4(a)" because the record remained "sufficiently concrete to permit this court to review the application of the regulation to the project and to determine if the regulations as applied are consistent with the ARA."  Id. at 696.  As for the other regulations, the court held that Earth Island's challenge was not ripe:

> Earth Island has not shown that the other challenged regulations were applied in the context of the Burnt Ridge Timber Sale or any other specified project.  The record is speculative and incomplete with respect to the remaining regulations, so the issues are not fit for judicial decision . . . .  While Earth Island has established sufficient injury for standing purposes, it has not shown the sort of injury that would require immediate review of the remaining regulations.  There is not a sufficient "case or controversy" for us to review regulations not applied in the context of the record before this court.

Id.

The Ninth Circuit went on to affirm the district court's invalidation of §§ 215.4(a) and 215.12(f).  It remanded the judgment and injunction with respect to the remaining regulations with instructions to vacate for "lack of a controversy ripe for review."  Id. at 699.

1     The Supreme Court reversed the Ninth Circuit on the issue of

2  standing, holding that the settlement of the dispute over the Burnt

3  Ridge Project deprived Earth Island Institute of standing because

4  the organization was no longer suing on the basis of an injury

5  resulting from application of the challenged regulations in a

6  specific context:

7       Respondents have identified no other application of the
        invalidated regulations that threatens imminent and
8       concrete harm to the interests of their members.   The
        only . . . affidavit relied on was that of Jim Bensman.
9       He asserted, first, that he had suffered injury in the
        past from development on Forest Service land.  That does
10      not suffice for several reasons: because it was not tied
        to application of the challenged regulations, because it
11      does not identify any particular site, and because it
        relates to past injury rather than imminent future injury
12      that is sought to be enjoined.

13      Bensman's affidavit further asserts that he has visited
        many National Forests and plans to visit several unnamed
14      National Forests in the future.  Respondents describe
        this as a mere failure to "provide the name of each
15      timber sale that affected Bensman's interests."  It is
        much more (or much less) than that.  It is a failure to
16      allege that <u>any</u> particular timber sale or other project
        claimed to be unlawfully subject to the regulations will
17      impede a specific and concrete plan of Bensman's to enjoy
        the National Forests.  The National Forests occupy more
18      than 190 million acres, an area larger than Texas.  There
        may be a chance, but is hardly a likelihood, that
19      Bensman's wanderings will bring him to a parcel about to
        be affected by a project unlawfully subject to the
20      regulations.  Indeed, without further specification it is
        impossible to tell which projects are (in respondents'
21      view) unlawfully subject to the regulations. . . . [W]e
        are asked to assume not only that Bensman will stumble
22      across a project tract unlawfully subject to the
        regulations, but also that the tract is about to be
23      developed by the Forest Service in a way that harms his
        recreational interests, and that he would have commented
24      on the project but for the regulation.  Accepting an
        intention to visit the National Forests as adequate to
25      confer standing to challenge any Government action
        affecting any portion of those forests would be
26      tantamount to eliminating the requirement of concrete,
        particularized injury in fact.

27
   <u>Summers</u>, 129 S. Ct. at 1150-51 (citations omitted; emphasis in
28

16

original).

The Court further addressed the issue of procedural injury:

Respondents argue that they have standing to bring their
challenge because they have suffered procedural injury,
namely that they have been denied the ability to file
comments on some Forest Service actions and will continue
to be so denied.  But deprivation of a procedural right
without some concrete interest that is affected by the
deprivation -- a procedural right in vacuo -- is
insufficient to create Article III standing.  Only a
person who has been accorded a procedural right to
protect his concrete interests can assert that right
without meeting all the normal standards for
redressability and immediacy.  Respondents alleged such
injury in their challenge to the Burnt Ridge Project,
claiming that but for the allegedly unlawful abridged
procedures they would have been able to oppose the
project that threatened to impinge on their concrete
plans to observe nature in that specific area.  But Burnt
Ridge is now off the table.

Id. at 1151 (citation and internal quotation marks omitted;

emphasis in original).

Having concluded that Earth Island Institute lacked standing

to challenge §§ 215.4(a) and 215.12(f), the Supreme Court did not

reach the question of whether the regulations were ripe for review.

The Court affirmed the dismissal, which Earth Island Institute had

not appealed, of the six regulations that were not applied to the

Burnt Ridge Project.

The USDA asserts that, like Earth Island Institute, Citizens

challenges a regulation with broad application that has not been

applied in a particular context and thus has not given rise to any

cognizable injury.  It argues that Citizens may not challenge any

procedural infirmities underlying the 2008 Rule except in

connection with a challenge to a site-specific plan approved under

a LRMP that was developed or revised pursuant to the Rule.

The Court is bound to follow the Ninth Circuit's decision in

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Citizens I unless Summers is clearly irreconcilable with that decision.  And, as Citizens points out, the challenge at issue in Summers is distinguishable in important respects from the challenge at issue here and in Citizens I.  Summers involved a substantive challenge to regulations that exempted certain projects from procedural requirements that would ordinarily apply.  The plaintiffs in Summers could not possibly suffer the procedural injury that was the basis of their standing until the regulations were actually applied to specific projects.  Once the dispute over the Burnt Ridge Project was settled, the Summers plaintiffs were left with a hypothetical future procedural injury that was insufficient to confer standing.  In contrast, the present case involves a challenge, not to the substance of any particular regulation, but to the Forest Service's failure to follow proper procedures when promulgating the 2008 Rule.  Citizens has already suffered the procedural injury that forms the basis of its standing; it was injured by the USDA's failure to take a hard look at the environmental consequences of its action.  Unlike in Summers, where the injury was the deprivation of Earth Island Institute's opportunity to provide comments on and subsequently appeal a specific decision, here the injury will not become more concrete when the Rule is applied to an LRMP or a site-specific plan.

Furthermore, Citizens' numerous detailed declarations demonstrate that its members have future plans to visit specifically identified sites within the National Forest System in the future.  The Ninth Circuit found in Citizens I that such declarations are sufficient to establish that the members have a

18

United States District Court
For the Northern District of California

concrete interest in the aesthetic and recreational value of the National Forest System -- an interest that is jeopardized by the procedural injury they have suffered.  The declarations here are not lacking in specificity, as was the declaration in <u>Summers</u>.

It is true that the <u>Summers</u> Court's discussion of procedural injury could be interpreted as prohibiting a challenge based on such an injury unless the plaintiff has concrete plans to visit a specific site that faces the threat of imminent harm as a direct result of the regulation tainted by procedural defects.  However, it is not clear that the Supreme Court intended for such a rule to apply when, as here, the procedural injury in question will never be directly linked to a site-specific project.  The overarching nature of the plan development rule makes it impossible to link the procedural injury at issue here to any particular site-specific project, whether now or in the future.  Waiting to adjudicate the validity of the Rule until an LRMP is revised under it and a site-specific plan is later approved under that LRMP would not present the court with any greater a "case or controversy" with respect to the already-completed procedural violation than exists today.  Rather, such an approach would insulate the procedural injury from judicial review altogether.  If Citizens is forced to delay seeking redress for its procedural injury until a site-specific plan is approved under a revised LRMP, it would face a statute of limitations defense.  The government might also argue that the procedural injury is not sufficiently tied to the project to confer standing.  Moreover, it would be a waste of the government's resources if it were to revise an LRMP and approve a site-specific plan, only to have both declared invalid because the 2008 Rule

19

pursuant to which the LRMP was created was procedurally defective.

Although <u>Summers</u> casts doubt upon whether the Ninth Circuit's holding in <u>Citizens I</u> with respect to standing continues in force, the Court cannot conclude that the two cases are clearly irreconcilable.  Accordingly, the Court adheres to <u>Citizens I</u> and finds that Citizens has standing to assert its claims.  In addition, <u>Summers</u> did not reach the issue of ripeness and thus did not disturb the Ninth Circuit's holding in <u>Citizens I</u> that Citizens' procedural challenges to the 2000 Rule were ripe for review.  The present case is indistinguishable from <u>Citizens I</u> with respect to this issue, and the Court therefore concludes that Citizens' procedural challenges are ripe for review.

II.  NEPA Claim

"NEPA requires agencies to take a 'hard look' at the environmental consequences of their actions by preparing an EIS for each 'major Federal action significantly affecting the quality of the human environment.'"  <u>The Lands Council v. McNair</u>, 537 F.3d 981, 1000-01 (9th Cir. 2008) (quoting 42 U.S.C. § 4332(C)).  "The EIS must 'provide [a] full and fair discussion of significant environmental impacts' so as to 'inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'"  <u>Id.</u> at 1001 (quoting 40 C.F.R. § 1502.1).  The EIS must discuss:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of

20

United States District Court
For the Northern District of California

1    long-term productivity, and

2    (v) any irreversible and irretrievable commitments of
     resources which would be involved in the proposed action
3    should it be implemented.

4 42 U.S.C. § 4332(C).

5        Although the USDA maintains that it prepared a thorough EIS

6 prior to promulgating the 2008 Rule, the EIS does not actually

7 analyze the environmental effects of implementing the Rule.

8 Instead, the EIS repetitively insists -- as the USDA insists in

9 connection with the present motion and has insisted since Citizens

10 I -- that the Rule will have no effect on the environment because

11 it merely sets out the process for developing and revising LRMPs

12 and is removed from any foreseeable action that might affect the

13 environment.  This position was rejected in Citizens I and Citizens

14 II, and the Court adheres to the reasoning set out in those

15 decisions.

16       The 2008 Rule eliminates or modifies standards that applied to

17 all LRMPs and site-specific plans.  For example, the 2008 Rule does

18 not require that LRMPs and site-specific plans "insure" the

19 viability of existing vertebrate species, as the 1982 Rule did, or

20 even provide a "high likelihood" of viability, as the 2000 Rule

21 did.  Instead, the 2008 Rule states a goal of providing a

22 "framework to contribute to sustaining native ecological systems by

23 providing appropriate ecological conditions to support diversity of

24 native plant and animal species in the plan area."  36 C.F.R.

25 § 219.10(b).  Although the EIS discusses the differences between

26 the various standards, it fails to acknowledge the effect of

27 eliminating the viability requirement.  According to the EIS

28 itself, the requirement was not incorporated in the 2008 Rule

21

because of the practical difficulty of complying with it.  It is
disingenuous for the USDA now to maintain that it has no idea what
might happen if it is no longer required to comply with the
requirement.  As the Ninth Circuit found, the "USDA's argument
. . . that there is no reason to believe that lower environmental
safeguards at the national programmatic level will result in lower
environmental standards at the site-specific level [] suggests that
it conceives of plan development rules merely as exercises in
paper-pushing." <u>Citizens I</u>, 341 F.3d at 975.  At the very least,
the EIS must discuss instances where the USDA has found the
viability requirement to be difficult to implement and analyze the
impact of no longer having to ensure species viability in those
instances.  The same is true with the rest of the EIS chapter
entitled "Affected Environment and Environmental Consequences."
The EIS discusses the differences between the identified
alternatives and explains why the USDA prefers Alternative M, but
it does not actually discuss the environmental consequences of
eliminating the specific protections that are provided in previous
plan development rules.

Because the EIS does not evaluate the environmental impacts of
the 2008 Rule, it does not comply with NEPA's requirements.

III. ESA Claim

Section 7 of the ESA requires federal agencies to "insure that
any action authorized, funded, or carried out by such agency . . .
is not likely to jeopardize the continued existence of any
endangered species or threatened species or result in the
destruction or adverse modification of habitat of such species."
16 U.S.C. § 1536(a)(2).  It requires agencies to consult with the

1   FWS or NMFS in connection with any action that "may affect" an

2   endangered or threatened species.  50 C.F.R. § 402.14(a).  <u>Citizens</u>

3   <u>II</u> explains the consultation process:

4           [T]he agency contemplating action must request
            information from the appropriate federal consulting
5           agency . . . regarding whether any species which is
            listed or proposed to be listed may be present in the
6           area of such proposed action.  [¶] If so, and if the
            action constitutes a "major construction activity," then
7           the agency is required to produce a biological assessment
            (or "BA") in accordance with ESA for the purpose of
8           identifying any endangered species or threatened species
            which is likely to be affected by such action. . . . If
9           the biological assessment concludes that there are no
            listed species or critical habitat present that are
10          likely to be adversely affected, and the wildlife agency
            confers, then formal consultation is not required.
11          However, if the biological assessment concludes that
            listed species are in fact likely to be adversely
12          affected, the agency then must ordinarily enter into
            formal consultation with the wildlife service.

13
            . . .
14
            Where a proposed action "may affect" endangered and
15          threatened species, but the agency desires to avoid the
            lengthy and costly process of formal consultation, it may
16          first initiate informal consultation.  Informal
            consultation, which includes all discussions,
17          correspondence, etc., between the agency and the wildlife
            service, may serve as a precursor to formal consultation.
18          However, if informal consultation results in a finding of
            no effect, then the consultation process is terminated,
19          and no further action is required.  If informal
            consultation results in a finding, though, that the
20          action is likely to adversely affect listed species or
            habitat, then subsequent formal consultation is required.
21
            Formal consultation requires the wildlife agency to
22          produce a "biological opinion" that evaluates the nature
            and extent of the proposed action's effect on the listed
23          species and that, if necessary, posits reasonable and
            prudent alternatives to the proposed action.
24
    481 F. Supp. 2d at 1091-92 (internal quotation marks and citations
25
    omitted).  The court in <u>Citizens II</u> found that the USDA had failed
26
    to comply with the ESA's consultation requirement because the 2005
27
    Rule "may affect" endangered or threatened species, but the USDA
28

                                     23

**United States District Court**
For the Northern District of California

1    did not prepare a BA or engage in consultation of any kind with the

2    FWS or NMFS.

3        The USDA argues that it has complied with the ESA because it

4    engaged in informal consultations with the wildlife agencies and

5    prepared a BA.  Because, in the USDA's view, the BA reasonably

6    concluded that the 2008 Rule would have no effect on endangered or

7    threatened species, the USDA was not required to obtain the

8    wildlife agencies' concurrence or enter into formal consultations.

9        The <u>Citizens II</u> court found that the 2005 Rule "may affect"

10   endangered and threatened species.  The 2008 Rule "may affect"

11   those species for the same reasons.  In order to avoid having to

12   enter into formal consultations with the wildlife agencies, the

13   USDA was thus required either to prepare a BA concluding that the

14   Rule was not likely to have an effect and to obtain the agencies'

15   concurrence therewith, <u>see</u> 50 C.F.R. § 402.12(k)(1), or to engage

16   in informal consultations that resulted in a determination, "with

17   the written concurrence" of the agencies, that the Rule was not

18   likely to have an effect, <u>see</u> 50 C.F.R. § 402.13(a).  It is

19   undisputed that the USDA did not submit its BA to the FWS or NMFS

20   for their concurrence.  And although the USDA engaged in

21   correspondence with the wildlife agencies before it completed its

22   BA, it is also undisputed that the agencies did not issue a written

23   concurrence with the USDA's finding that the 2008 Rule would have

24   no effect on endangered species.  Although an agency may be excused

25   from the ESA's consultation requirements if it concludes that its

26   proposed action will have "no effect" on protected species (as

27   opposed to concluding that is "unlikely to affect" protected

28   species), <u>see</u> <u>Sw. Ctr. for Biological Diversity v. U.S. Forest</u>

Serv., 100 F.3d 1443, 1447-48 (9th Cir. 1996), two courts have rejected USDA's argument that the programmatic nature of the plan development rule necessarily means that it will have no effect on the environment or protected species.  The USDA has simply copied those rejected legal arguments in a new document and called it a "Biological Assessment."  This is not sufficient to satisfy the ESA's requirements.

IV.    Remedy

       "Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action.  In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations."  Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs, 486 F.3d 638, 654 (9th Cir. 2007), rev'd on other grounds, Coeur Alaska, Inc. v. Se. Alaska Conservation Council, ___ U.S. ___, 2009 WL 1738643 (2009) (citation and internal quotation marks omitted). Accordingly, the Court vacates the 2008 Rule, enjoins the USDA from further implementing it and remands it to the USDA for further proceedings.

       "The effect of invalidating an agency rule is to reinstate the rule previously in force."  Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir. 2005).  It appears that the 2000 Rule was in force before the 2008 Rule was promulgated.[1]  However, the USDA has expressed in the past its view that the 2000 Rule is unworkable in practice. Accordingly, the agency may choose whether to reinstate the 2000

---

       [1]Although the 2000 Rule was challenged in Citizens I, because the USDA announced in 2002 its intent to supersede the 2000 Rule, the challenge was dropped before the validity of the 2000 Rule had been adjudicated.

United States District Court
For the Northern District of California

1  Rule or, instead, to reinstate the 1982 Rule.

2                              CONCLUSION

3       For the foregoing reasons, Citizens' motion for summary

4  judgment (Docket No. 40) is GRANTED and the USDA's cross-motion for

5  summary judgment (Docket No. 41) is DENIED.  The 2008 Rule is

6  VACATED and REMANDED to the USDA for further proceedings consistent

7  with this order.  The clerk shall enter judgment and close the

8  file.

9       IT IS SO ORDERED.

10

11 Dated: 6/30/09                  _____

12                                 CLAUDIA WILKEN
                                   United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California